COMMONWEALTH *vs.* ROBERT S. WILSON.

Franklin. December 3, 1986. — March 16, 1987.

Present: HENNESSEY, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.

*Interstate Agreement on Detainers. Uniform Criminal Interstate Rendition Act. Extradition and Rendition.*

With respect to a defendant seeking to have his convictions on certain criminal charges vacated on the grounds that, in violation of the Interstate Agreement on Detainers, St. 1965, c. 892, he had not been brought to trial within 120 days after being brought to Massachusetts from New Hampshire, and had been returned to New Hampshire before his Massachusetts trial began, this court held that neither of two executive agreements concluded between the Governors of Massachusetts and New Hampshire pursuant to the Uniform Criminal Interstate Rendition Act, G. L. c. 276, §§ 11-20R, the first of which had secured the defendant's presence for trial on unrelated Massachusetts indictments, constituted the "written request for temporary custody" contemplated by art. IV *(a)* of the agreement for triggering the start of the 120-day period. [459-463]

The issuance in Massachusetts of a writ of habeas corpus ad prosequendum to secure a defendant's presence for trial of charges against him constituted, in the case of a New Hampshire prisoner then present in Massachusetts for trial on unrelated indictments, a "written demand for temporary custody" for purposes of triggering the start of the 120-day period prescribed by art. IV *(c)* of the Interstate Agreement on Detainers, St. 1965, c. 892, and, where the defendant was brought to trial within 120 days of the issuance of the writ and never returned to New Hampshire during that time, the requirements of the agreement were fulfilled. [463-464]

INDICTMENTS found and returned in the Superior Court on January 12, 1977.

A motion for postconviction relief, filed on November 17, 1981, was heard by *John F. Moriarty, J.*

The Supreme Judicial Court on its own initiative transferred the cases from the Appeals Court.

*Lois M. Lewis* for the defendant.

*Stephen R. Kaplan,* Special Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant, Robert S. Wilson, was convicted in 1977 of armed robbery of Joseph A. Sceposki and the murder in the second degree of Sceposki and Edward F. Flavin (the Greenfield charges). In 1981, he filed a motion under Mass. R. Crim. P. 30 (a), 378 Mass. 900 (1979), to set aside the convictions based upon claimed violations of the Interstate Agreement on Detainers (agreement). St. 1965, c. 892. The trial judge denied the motion and Wilson appeals.[1] We transferred the case to this court on our own motion. We affirm.

The defendant was imprisoned in New Hampshire when the murder and armed robbery charges which are the subject of this appeal were instituted against him. The defendant was also convicted of the murders of Dr. Hugh Mahoney, his wife, Ruth, and their son, John, in Tewksbury, Massachusetts. *Commonwealth* v. *Wilson,* 381 Mass. 90 (1980). In order for the defendant to be prosecuted first for the Tewksbury murders and then for the present charges, he was transferred to Massachusetts under two executive agreements between the Governors of Massachusetts and New Hampshire pursuant to the Uniform Criminal Interstate Rendition Act, G. L. c. 276, §§ 11-20R (1984 ed.). The defendant argues that these transfers were illegal, that the agreement was the exclusive method of transferring him to Massachusetts, and that because he was not tried on these charges within 120 days of being brought to Massachusetts and because he was returned to New Hampshire before his trial on these charges, in violation of the agreement, the charges must be dismissed.

The relevant facts, as stipulated by the parties and found by the judge, are as follows. On July 12, 1976, the defendant was incarcerated in the Cheshire County correctional facility in New Hampshire. He was serving a one-year sentence and was also being held in lieu of $50,000 bail on other pending charges. On that day, complaints were entered in the Lowell Division of the District Court Department charging the defend-

---

[1] The record is unclear as to what transpired between 1981, when the motion was filed and the trial judge appointed counsel, and 1985, when the judge denied the motion.

ant with having committed the Tewksbury murders. A warrant was issued for the defendant's arrest.

On July 15, 1976, the office of the district attorney for the Northern District requested that the Governor of Massachusetts seek the defendant's rendition from the Governor of New Hampshire. On July 27, 1976, the Governors entered into an agreement for rendition of the defendant to Massachusetts. The Governor of New Hampshire agreed that he would permit the defendant to be released from "time to time" to officials of the Commonwealth in order that he might attend proceedings on the Massachusetts murder charges which were pending against him. The Governor of Massachusetts agreed on his part that, upon the completion of each proceeding, the Massachusetts officials would, at the request of New Hampshire, return the defendant to the custody of New Hampshire officials.

On September 22, 1976, a judge in the New Hampshire Superior Court granted rendition, after hearing. The defendant was transported to Massachusetts on October 6, 1976, where he was held at the Essex County house of correction. Thereafter, the defendant was transported between Massachusetts and New Hampshire several times for proceedings related to the Tewksbury murder charges.

Complaints charging the defendant with the Greenfield crimes were issued from the Greenfield Division of the District Court Department on November 10, 1976. On November 30, 1976, a detainer relating to these Greenfield charges was lodged with the New Hampshire State prison at Concord, New Hampshire, where the defendant was then incarcerated. In December, 1976, the defendant was transported to Massachusetts to answer indictments returned by a Middlesex County grand jury charging him with the Tewksbury murders. Immediately after his arraignment he was again returned to New Hampshire.

On January 12, 1977, a Franklin County grand jury returned the indictments from which the defendant now seeks relief, charging him with the Greenfield murders and the Sceposki robbery. On January 20, 1977, the Massachusetts State police lodged a new detainer with the New Hampshire authorities on the basis of the Franklin County indictments.

On February 11, 1977, the defendant was convicted of and sentenced for another New Hampshire armed robbery. He was taken again to Massachusetts in March for pretrial hearings in connection with the Tewksbury murders. He remained in Massachusetts until April 9, 1977, when he was returned to New Hampshire. He was finally transferred to Massachusetts for trial on the Tewksbury charges on April 28, 1977. On June 14, 1977, he was convicted of the Tewksbury murders. After the defendant was convicted of and sentenced for the Tewksbury murders, he was immediately remanded to the Essex County house of correction.

On May 15, 1977, while the Tewksbury trial was in progress, the Governors of Massachusetts and New Hampshire entered into a second agreement pursuant to the provisions of G. L. c. 276, § 20K.[2] By the terms of that agreement, New Hampshire agreed that the defendant could be "retained" by Massachusetts officials to attend proceedings on the Greenfield charges, and Massachusetts agreed that upon completion of each proceeding in Massachusetts, the Massachusetts officials at the request of New Hampshire would return the defendant to New Hampshire custody.

On June 16, 1977, the Commonwealth's petition for writ of habeas corpus ad prosequendum was allowed. The defendant was arraigned on the Franklin County indictments and ordered held in Springfield without bail while awaiting trial.[3] Trial commenced on October 11, 1977.

---

[2] General Laws c. 276, § 20K (1984 ed.), provides in pertinent part: "Whenever it is desired to have returned to this commonwealth a person charged herein with a crime, or with having been convicted in this commonwealth and having escaped from confinement or having broken the terms of his bail, probation or parole, and such person is imprisoned or is held under criminal proceedings then pending against him in another state, the governor may agree with the executive authority of such other state for the interstate rendition of such person before the conclusion of such proceedings or of his term of sentence in such other state, upon such conditions relative to the return of such person to such other state at the expense of this commonwealth as may be agreed upon between the governor and the executive authority of such other state."

[3] On August 18, 1977, the defendant's motion for a change of venue was allowed and the case was transferred to Worcester County for trial.

On October 21, 1977, the jury returned verdicts of guilty of murder in the second degree on each of the two indictments charging murder, and a verdict of guilty of armed robbery.

This case requires us to examine the application of the Uniform Criminal Interstate Rendition Act, G. L. c. 276, §§ 11-20R (Uniform Act), and the Interstate Agreement on Detainers, both of which are in effect in this Commonwealth.[4] Both the Uniform Act and the agreement are concerned with obtaining the presence of persons charged with crime in one State who have removed to another State. They differ chiefly in their application: The Uniform Act applies to rendition proceedings involving Governors, whereas the agreement is concerned with the efforts of a prosecutor to secure the presence of a prisoner incarcerated in another State.[5] See also U.S. Const. art. IV, § 2 (requiring each State, on the demand of the executive authority of another State [receiving state][6], to deliver any person charged in that State with "treason, felony, or other crime").

Under the Uniform Act the Governors of two States may enter into an agreement for the rendition of a person presently in the sending State before the conclusion of the proceedings against him or of the term of his sentence in that State, "upon such conditions relative to the return of such person to such other state at the expense of this commonwealth as may be agreed upon between the governor and the executive authority of such other state." G. L. c. 276, § 20K. This procedure was followed in the instant case. The Uniform Act further provides that before a prisoner may be surrendered he must first be

---

[4] The Uniform Act was adopted in 1937 (St. 1937, c. 304) and the Commonwealth became a party to the agreement in 1966 (St. 1965, c. 892, approved January 7, 1966).

[5] Additionally, unlike the Uniform Act, the agreement applies only to incarcerated persons.

[6] The Uniform Act uses the term "demanding state" to describe the State having untried charges pending against a person, whereas the agreement uses the term "receiving state." The agreement also defines the State where a prisoner is presently located as the "sending state." The agreement's terms are used throughout for consistency.

brought before a judge in the sending State and afforded an opportunity to contest the validity of his transfer. G. L. c. 276, § 19. This procedure was also followed in the case of the defendant.

The agreement simplifies the rendition procedure in the case of a person imprisoned in the sending State. The central provisions of the agreement are contained in art. III and art. IV. Article III outlines a procedure by which a prisoner against whom a detainer[7] has been filed can demand a speedy disposition of the charges giving rise to the detainer. See *Commonwealth* v. *Martens,* 398 Mass. 674 (1986). Article IV, which is at issue here, sets forth the procedure by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges.

It is clear that the provisions of art. IV of the agreement[8] are triggered only when a "detainer" is filed with the sending State by the receiving State having untried charges pending against the prisoner *and* the receiving State files an appropriate "request" for temporary custody with the sending State. *United States* v. *Mauro,* 436 U.S. 340, 343-344 (1978).

Article IV (*a*) provides that after the detainer has been lodged, the "appropriate officer" of the receiving State "shall be entitled" to have such prisoner "made available . . . upon presentation of a written request for temporary custody or availability to the appropriate authorities" of the sending State. It is also required that the request be "approved, recorded and transmitted" by a competent court in the receiving State.[9]

---

[7] The agreement itself contains no definition of the word "detainer." However, the House and Senate Reports accompanying Congress's adoption of the agreement define a detainer as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." H.R. Rep. No. 91-1018, at 2 (1970). S. Rep. No. 91-1356, at 2 (1970). See *United States* v. *Mauro,* 436 U.S. 340, 359 (1978).

[8] The defendant does not rely on the provisions of art. III of the agreement.

[9] Article IV (*a*) provides in full: "The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending, shall be entitled to have a prisoner against whom he has lodged a detainer and

If the request referred to in art. IV (*a*) is approved by the sending State, trial must begin within 120 days after the prisoner's arrival in the receiving State (or prior to his return to the sending State). Art. IV (*c*). Art. IV (*e*). Article V (*c*) provides:

> "If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect."

The defendant urges that the Franklin County indictments should have been dismissed, because he was not brought to trial on those indictments within 120 days after his arrival in Massachusetts and also because he was returned to New Hampshire on several occasions after he was originally transferred to Massachusetts to answer the Tewksbury charges. Our view of when the agreement became applicable to the defendant leads us to conclude that the defendant was brought to trial within the agreement's requirements.

who is serving a term of imprisonment in any party state made available in accordance with paragraph (*a*) of Article V upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided, that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request; and, provided further, that there shall be a period of thirty days after receipt by the appropriate authorities before the request is honored within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon the motion of the prisoner."

Though art. IV does not specifically refer to a pretransfer hearing such as provided for in G. L. c. 276, § 19, the United States Supreme Court has held that a prisoner against whom a detainer has been lodged and whose delivery to another State has been requested in accordance with art. IV is entitled to the procedural safeguards afforded by the Uniform Act, including the right to a pretransfer hearing. *Cuyler* v. *Adams,* 449 U.S. 433, 448-449 (1981).

Contrary to the defendant's suggestion, the agreement is not the exclusive means of securing an out-of-State prisoner for disposition of charges pending within the Commonwealth. *State* v. *Bailey,* 262 N.W.2d 406 (Minn. 1977). *People ex rel. DeGina* v. *Delaney,* 56 A.D.2d 614 (N.Y. 1977). Cf. *United States* v. *Mauro, supra* (transfer from State to Federal custody pursuant to writ of habeas corpus ad prosequendum); *United States* v. *Kenaan,* 557 F.2d 912 (1st Cir. 1977), cert. denied, 436 U.S. 943 (1978) (same). The Supreme Court has expressly held that the provisions of the Uniform Act in a State which has adopted it remain fully applicable even when a detainer has been lodged and the prosecution proceeds under art. IV. *Cuyler* v. *Adams, supra* at 448.

However, while the agreement is not the exclusive means for securing the interstate transfer of prisoners, the Supreme Court has recharacterized some attempts to proceed outside the agreement as nonetheless triggering the agreement.[10] See, e.g., *United States* v. *Mauro, supra* at 361-362 (writ of habeas corpus ad prosequendum constitutes a "written request for temporary custody" within the meaning of art. IV [*a*], and United States is thereby bound when it activates the agreement's provisions by filing a detainer against a State prisoner and then obtains his custody by means of a writ of habeas corpus ad prosequendum). Thus, it is necessary to determine whether any actions of the Commonwealth might have triggered, albeit inadvertently, the agreement.

No detainer was ever lodged against the defendant in connection with the Tewksbury murders and therefore the agreement was never triggered with respect to those charges. However, in the Greenfield cases two detainers were filed; the first on November 30, 1976, after the complaints had issued from the

---

[10] The agreement is an interstate compact approved by Congress (4 U.S.C. § 112(a) [1982]); see [1970] U.S. Code Cong. & Ad. News 4866), as required by art. I, § 10, cl. 3 of the United States Constitution. *Cuyler* v. *Adams, supra* at 438-442. The United States Supreme Court is the final interpreter of such a compact. *West Virginia ex rel. Dyer* v. *Sims,* 341 U.S. 22, 28 (1951). *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275, 278 & n.4 (1959).

Greenfield District Court and the second on January 20, 1977, after the indictments were returned by the Franklin County grand jury. We are thus compelled to consider whether a "request for temporary custody or availability" was ever made to the New Hampshire authorities in accordance with art. IV (*a*).

We think the statutory language makes clear that the executive agreements entered into by the Governors of Massachusetts and New Hampshire under the Uniform Act cannot be termed a "request" under art. IV (*a*). Article IV (*a*) specifically requires that the written request referred to in that section be duly "approved, recorded and transmitted" by the court having jurisdiction of such indictment, information, or complaint. No request was ever "approved, recorded and transmitted" by a court having jurisdiction over the Franklin County indictments. See *Cuyler* v. *Adams, supra* at 448, quoting Council of State Governments, Suggested State Legislation, Program for 1957, at 79 (1956) (distinguishing art. III from art. IV and noting, "[i]n Article IV the prosecutor initiates the proceeding").

Though the executive agreements executed under the Uniform Act do not constitute requests for custody under art. IV (*a*) of the agreement, we think the writ of habeas corpus ad prosequendum, granted on June 16, 1977, must be deemed such a request in light of *United States* v. *Mauro, supra*. While *United States* v. *Mauro* involved a Federal writ of habeas corpus ad prosequendum, we perceive its reasoning to be equally applicable to an analogous State writ.

> "It matters not whether the Government presents the prison authorities in the sending State with a piece of paper labeled 'request for temporary custody' or with a writ of habeas corpus *ad prosequendum* demanding the prisoner's presence in federal court on a certain day; in either case the United States is able to obtain temporary custody of the prisoner. Because the detainer remains lodged against the prisoner until the underlying charges are finally resolved, the Agreement requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State. The fact that

the prisoner is brought before the district court by means of a writ of habeas corpus *ad prosequendum* in no way reduces the need for this prompt disposition of the charges underlying the detainer. In this situation it clearly would permit the United States to circumvent its obligations under the Agreement to hold that an *ad prosequendum* writ may not be considered a written request for temporary custody" (footnote omitted). *Id.* at 362.

However, the defendant's reliance on the agreement in this case is to no avail. He was brought to trial on the Franklin County indictments on October 11, 1977, which was within 120 days of the granting of the writ as prescribed by art. IV (*c*), and was never returned to New Hampshire during that time. Where the defendant was brought to trial within the agreement's requirements, he may not now invoke its sanctions.

We have considered the remainder of the defendant's arguments and consider them to be without merit.

*Order affirmed.*