STATE of Missouri, Plaintiff–
Respondent,

v.

Kenneth BUSCH, Defendant–Appellant.

Kenneth BUSCH, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 63904, 67254.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 12, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 24, 1996.

Robert E. Steele, Jr., Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

DOWD, Judge.

Defendant appeals the judgments entered upon his convictions by a jury for murder in the first degree, § 565.020.1, RSMo 1986, and armed criminal action, § 571.015.1, RSMo 1986. The trial court sentenced Defendant to life imprisonment without possibility of probation or parole for the murder and a consecutive life term of imprisonment for the armed criminal action. Defendant also appeals the denial, after an evidentiary hearing, of his Rule 29.15 motion for post-conviction relief. We affirm.

The State charged John Detert, Jeffery Babb, and Defendant with the murder of victim. Detert entered a plea bargain pleading guilty to second-degree murder in exchange for his cooperative testimony against Defendant and Babb. Defendant and Babb

were tried separately. The State tried Defendant as an accomplice to the murder.

The evidence adduced at trial was as follows. In July 1991, the police received a report victim was missing. Officer Anthony Miller of the City of St. Louis Police Department was called to victim's St. Louis apartment located on Cherokee Street. Officer Miller noticed blood leading from the common area of the second floor apartment, down the outside staircase, across the patio at the foot of the staircase, and into an alley adjacent to the apartment building. Officer Harold Mansfield of the St. Louis Police Department's evidence technicians unit reported to victim's apartment. He similarly testified he saw "[b]lood stains on the steps coming from the second floor landing all the way down to the patio and across the brick to the alley." He collected samples of the blood stains including sections of carpeting in the common area of the two second floor apartments. Subsequent testing indicated that the blood was human. Four tests were conducted comparing the DNA of the carpet blood stain samples and the blood of victim's parents. Two of the tests were inconclusive; two indicated the blood recovered from the carpet was consistent with having come from a child of victim's parents. Officer Mansfield further testified that a screen window leading into victim's apartment was damaged. Inside the apartment, the only exceptional observation was a telephone lying on the couch; a hole was in the wall where the telephone apparently would have been mounted.

On September 23, 1991, human remains, later identified as victim's, were discovered off a gravel road near a trash dump in a wooded area of St. Francois County. The bones were scattered in roughly a 100–foot circumference, and a section of charred ground was within the circumference. Dr. Michael Zaricor, a pathologist, was called to the scene. Victim's skull was found in several pieces. Dr. Zaricor stated that he found damage in the right parietal region of the skull indicative of a gunshot exit wound. In his opinion a gunshot caused victim's death. He also stated that the shatter damage to the skull was consistent with a blow from a blunt object that could have caused death.

The State put on a series of witnesses linking Defendant to victim's death. Victim's girlfriend testified that she was at victim's apartment in early July, shortly before his disappearance. She did not remember a hole in the wall where the telephone mounted. She testified that she had seen Defendant (whom she knew by the alias of Jeff Medler) at a St. Louis bar some time after victim's disappearance. Defendant approached her and asked her if she had seen victim. He then told her that he "blue [sic] his f___ing head off." She further testified Defendant said, "He died real slow, and he deserved it. And at one point, he said he danced on his face and something about burning him." Defendant also asked her if she were pregnant by victim. She said no, and he replied, "good, because he would have killed it."

A bartender who worked at a bar frequented by Defendant also testified. She had seen Defendant with a .38 caliber handgun. She said she overheard Defendant say "he was having problems with someone, and thinks he had to take care of him." And again heard him say "[t]hat he had to take care of this problem; this individual was really giving him a problem."

Jeffry Babb's girlfriend also testified. She met Defendant through Babb. She testified Defendant and Babb were at her apartment in February, 1992. Babb had left the room and Defendant told her "that he [Defendant] did somebody."

> He told me that he and Jeff [Babb] and John [Detert] went to the guy's apartment. And [Defendant] broke in and Jeff and him went upstairs. And [Defendant] shot him; and they put him in a sleeping bag and took him downstairs and put him in the car and then drove him out wherever they took him ... He told me that when he got down to wherever, they shot him again.

She testified that on another occasion she heard Defendant ask John Detert what happened to the gun and to get rid of the gun. He also "said the motherf___er deserved what he got."

Defendant's roommate and sometime romantic interest (hereinafter "C.K.") also testified. She said that sometime prior to June of 1991 she discovered guns in their shared apartment. She was concerned for the safety of her child and asked Defendant to remove the weapons. Later in June of 1991, C.K. was sleeping in the apartment living room when she awoke to see a white male exiting the apartment. That day or the next, Defendant began accusing an unnamed person of having stolen a gun. John Detert came to the apartment, and they searched for the gun. C.K. overheard Defendant say, "Nobody steals from me and gets away with it." Over the next few days C.K. heard Defendant ask Detert about getting a "silencer" so that Defendant could "take care of business." Defendant said he was giving that individual ten days to return the gun. He said he had talked to the individual and that individual claimed not to know about the gun. She further overheard Defendant "talking to John [Detert] about July 4th would be a perfect weekend to do it, because with the fireworks and firecrackers, you wouldn't hear the sounds of the gun or it wouldn't be as noticeable."

On the Saturday following the 4th of July, C.K. permitted Defendant to borrow her car. At approximately 7:30 or 8:00 a.m. Sunday morning, Defendant, Detert, and Babb returned to her apartment. They were acting excited and silly. C.K. noticed Defendant's left hand was swollen. He said he was teaching Babb to swing a baseball bat.

At approximately 2:30 p.m. that same Sunday, C.K. went to use her car. She testified that it smelled horrible "like rotten meat." She noticed that the carpeting that covers the floor of the hatchback area was missing. She asked Defendant about the smell, and he laughingly responded, "I guess we left the meat in there too long." She heard Defendant tell Detert that they would have to clean the car out "again." A week or two later, C.K. discovered the hatchback carpeting draped over her apartment railing.

C.K. overheard Defendant say several inculpatory statements to Detert and Babb. Defendant once asked if "anybody knew where the body was." Defendant "said

something about the only evidence they would have is Jeff [Babb] pulled the phone cord out of the wall." Defendant further told "about they wrapped up the body in like a blanket, or throw cover, or something, that they had gotten from his apartment." "He said in the car on the way down where he dumped the body that he was moaning and groaning in the back."

In late August or early September of 1991, Defendant was held in a Missouri Penitentiary for an unrelated offense. C.K. and Detert visited Defendant, and Defendant instructed them to "get rid" of his "tie," which he informed was buried in C.K.'s backyard. C.K. testified that she understood "tie" as referring to a gun. Subsequently, C.K. drove Detert to a river where Detert exited the car holding a grocery bag, she heard a splash, and Detert returned to the car without the grocery bag. C.K. also testified that Defendant was very interested in the news, especially when stories about the discovery of victim's body began appearing in the newspaper. Defendant told C.K. "he was pretty sure that it wasn't the body, he said ... [he] didn't think it was the right one."

John Detert testified for the State. He explained that he had taken two of his father's guns to Defendant and C.K.'s apartment, an 1863 Colt .45 and a .38 caliber police service revolver. In June of 1991, Defendant told Detert that the Colt .45 had been stolen. He accused victim of having stolen the gun that morning. Detert did not know victim. Defendant told Detert he and victim had served prison time together and that he thought victim was a "punk." Defendant asked Detert for "help" with victim. Defendant was mad, "And he said he wanted to kill him."

Defendant, Babb, and Detert met at a local pub and discussed the 4th of July plan. Defendant talked about shooting victim and determined Detert would drive. However, Detert was arrested for a traffic violation prior to the 4th of July and was in jail until July 8. Detert testified that on July 14, 1991, he, Defendant, and Babb "did it."

Detert explained that Defendant drove C.K.'s car into the alley adjacent to victim's

Cherokee Street apartment. Defendant and Babb were dressed in jumpsuits and were wearing brown gloves. Defendant had the .38 caliber service revolver. Defendant and Babb got out of the car, and Detert drove out of the alley. He circled in C.K.'s car for approximately five to ten minutes when he heard a whistle. Detert stopped the car and Defendant told Detert to open the back of the car. Babb and Defendant had victim's body wrapped in a bloody blanket or sleeping bag. Detert tried to help them lift the body into the hatch area, but he had a prior shoulder injury. Once victim was placed in the hatch area of the car, the hatchback door locking mechanism was obstructed so that the hatchback door would not lock into the closed position. Detert got into the car's back seat and held down the hatch. Defendant drove and Babb sat in the front passenger seat. Victim began moving and mumbling. Detert complained that he was unable to hold both the hatchback door and victim because of his injured shoulder. Babb and Detert traded places. When victim moaned, Babb stabbed victim with a screwdriver.

Detert testified that Defendant explained what had happened in victim's apartment. Defendant mentioned he had shot victim and Babb had hit him with a bat. Defendant said Babb had torn the telephone off the wall. Defendant indicated this made him mad because it ruled out a "disappearance" and Defendant had wanted it to look like a "disappearance."

Detert testified that Defendant drove to a trash dump area down a gravel road where they took victim's body out of the car. Babb began striking victim with a bat while Detert struck him with a garden maul. Defendant "cut on" victim's lower abdomen with a buck knife and remarked it would look like a rape. They then dragged victim's body further into the woods and Detert set the body on fire. Defendant and Babb shot victim two or three more times. They returned to the car, drove back to St. Louis, and cleaned the car.

On re-direct examination, Detert was asked, "Whose idea was it to go that night and do this thing?" He responded, "It was [Defendant's]."

Defendant did not testify or present any evidence. In his closing argument, Defendant's counsel attacked the credibility of the State's witnesses and implied Defendant was not involved in the murder of victim.

■ In his first point on appeal, Defendant asks for our plain error review of Instruction No. 7 which was submitted to the jury as the first-degree murder verdict director. Defendant acknowledges the grounds raised on appeal were not preserved by objecting at trial or by his motion for new trial.

Instruction No. 7 was patterned after MAI–CR3d 313.02 modified by MAI–CR3d 304.04 and read, in pertinent part:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 14, 1991, in the City of St. Louis, State of Missouri, the defendant or John Detert or Jeffery Babb caused the death of William Timmons by shooting or stabbing or striking him, and

Second, that defendant knew or was aware that their conduct was causing or was practically certain to cause the death of William Timmons or that it was the defendant's purpose to cause the death of William Timmons, and

Third, that defendant *or* John Detert *or* Jeffery Babb did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that murder in the first degree, the defendant acted together with or aided or encouraged John Detert or Jeffrey [sic] Babb in committing

that offense, then you will find the defendant guilty under Count I of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree.... (Emphasis ours).

Defendant initially asserts Instruction No. 7 prejudiced him because the disjunctive "or" connectors in paragraph third created the possibility that the jury could have found Defendant guilty without finding he had the requisite mental state of having deliberated. Our Supreme Court has held that the verdict-directing instruction for first-degree murder "must ascribe the element of deliberation to the defendant specifically, even though the charge is premised on accessory liability." *State v. Ferguson*, 887 S.W.2d 585, 587 (Mo. banc 1994). Paragraph third's charge of the element of deliberation in the alternative form of "defendant or John Detert or Jeffery Babb" would allow the jury to find the element of deliberation without believing the Defendant had himself deliberated. This relieves the State of its burden of proof and constitutes error. *Id.*

■ The State concedes that the instruction was erroneous but argues Defendant has not fulfilled his plain error review burden of demonstrating the error resulted in manifest injustice. Instructional error is seldom plain error. *State v. Walton*, 703 S.W.2d 540, 542 (Mo.App.1985). "Defendant must go beyond a demonstration of mere prejudice and establish such a misdirection of the jury as would cause manifest injustice or a miscarriage of justice." *Id.* Our Supreme Court has recognized the difficulty of defining the phrase "manifest injustice or miscarriage of justice." *State v. Nolan*, 872 S.W.2d 99, 103 (Mo. banc 1994). " '[W]hether an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no "hard and fast classifications in either the application of the principle or the use of a descriptive title." ' " *Id.* (*quoting* 3A Charles Alan Wright, *Federal Practice and Procedure*, § 856 (1982)). "In the context of instruction-al error, plain error results when the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict." *Nolan*, 872 S.W.2d at 103.

Under the facts and circumstances presented, we cannot find plain error in the submission of Instruction No. 7. The record is fraught with evidence Defendant deliberated on the murder of victim. The evidence showed he planned on killing victim if victim did not return the missing gun. Defendant knew the victim and thought he was a punk. He discussed killing the victim for approximately a month, and the plan was discussed at various meetings. It included such reflective thought as attempting to procure or construct a "silencer" and shooting the victim during the 4th of July celebration to avoid detection. Defendant intended to make the killing look like a "disappearance" and became upset when Babb tore the telephone from the wall. He instructed Detert to move the car away from victim's apartment while he and Babb went into the apartment. He wore gloves in what was described as warm July weather. The evidence clearly supports a finding Defendant deliberated.

Defendant argues the jury could have found Detert or Babb deliberated while rejecting the evidence Defendant deliberated. Defendant relies on potential witness bias and noncredibility and certain inconsistencies in the evidence to attack the evidence of his deliberation. However, Instruction No. 7 required the jury to "find and believe from the evidence beyond a reasonable doubt each and all of these propositions" including that Defendant "with the purpose of promoting or furthering the commission of that murder in the first degree, ... acted together with or aided or encouraged John Detert or Jeffrey Babb in committing the offense,...." Under the facts and circumstances of this case, it escapes the bounds of reasonable possibility that a jury could have found Defendant "acted together with or aided or encouraged" the murder while rejecting the evidence of his deliberation. The only evidence of Defendant's participation in the murder described him as its promoter and planner. There was not one quantum of evidence a

juror could have reasonably inferred Defendant participated in the murder without deliberating. At trial, Defendant did not dispute the issue of deliberation, rather, he implied he did not participate in the murder at all. *See State v. Harnar*, 833 S.W.2d 25, 28 (Mo.App.S.D.1992) and cases collected therein ("cases ... hold that plain error has not occurred when an instruction omits an essential element of the crime where that omitted element was not specifically controverted."). While Defendant argues such a finding was *possible*, we believe such a possibility was extremely unlikely and unreasonable. Thus, it is not at all apparent the error in Instruction No. 7 affected the jury's verdict. We therefore hold the disjunctive paragraph third does not constitute manifest injustice, and there is no plain error.

In so holding, we are cognizant of the importance of finding the element of deliberation in order to convict a defendant of murder in the first degree. "Only where the defendant himself harbors this most despicable mental state does society inflict its severest punishments." *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993). We believe our holding preserves the importance of a deliberation finding in the manner prescribed by our Supreme Court. In *Ferguson, supra*, the Supreme Court of Missouri ordered a new trial for the same instructional error present here. The Court noted there was no witness to the murder, none of the co-defendants confessed, and the evidence of deliberation was entirely circumstantial. *Ferguson*, 887 S.W.2d at 587. The Court ordered a new trial only after finding "there was a *real possibility* that the jury did not determine that Ferguson, himself, deliberated." *Ferguson*, 887 S.W.2d at 587 (emphasis ours). Here, a co-defendant who was present at the murder testified and confessed, and the evidence of deliberation was not all circumstantial. Unlike *Ferguson*, no "real possibility" existed that Defendant did not deliberate.

Defendant's first point also asserts Instruction No. 7 is plainly erroneous because "[j]ust as in [*State v. Bell*, 854 S.W.2d 612 (Mo.App.E.D.1993) ] some members of the jury may have returned a verdict of guilty on one theory while simultaneously rejecting the other and vice versa." In *Bell*, the verdict director contained both principal liability and accomplice liability theories connected by the disjunctive "or." Unlike *Bell*, Instruction No. 7 presents no opposing theories. Instruction No. 7 provided only accomplice liability, and the jury was required to find *all* the propositions of Instruction No. 7 beyond a reasonable doubt to return a guilty verdict. Thus, each member of the jury determined Defendant's guilt under the same legal theory. Point denied.

We have reviewed Defendant's second point on appeal and find it without merit. An opinion detailing our holding would have no jurisprudential value. Rule 30.25(b). The motion court's findings of fact and conclusions of law denying Defendant's Rule 29.15 motion for post-conviction relief after an evidentiary hearing were not clearly erroneous; therefore, Defendant's final point on appeal is also denied. Rule 84.16(b).

We affirm.

CRAHAN, P.J., and CRANDALL, J., concur.