**STATE of Missouri, Respondent,**

v.

**Maurice T. DAVIS, Appellant.**

**No. WD 64993.**

Missouri Court of Appeals, Western District.

Sept. 12, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 31, 2006.

Application for Transfer Denied Jan. 30, 2007.

Maurice T. Davis, Jefferson City, pro se.

Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, for respondent.

Before VICTOR C. HOWARD, Presiding Judge, JOSEPH M. ELLIS, Judge, and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Judge.

Maurice T. Davis appeals from his conviction by jury of two counts of murder in the first degree, § 565.020, and two counts of armed criminal action, § 571.015. Appellant was sentenced to terms of life imprisonment without opportunity for probation or parole on the two murder counts and terms of life imprisonment on the armed criminal action counts. Appellant does not challenge the sufficiency of the evidence to support his conviction. Viewed in the light most favorable to the verdict, the evidence adduced at trial reflects the following.

Prior to August 6, 1997, Ernest Hill gave Appellant $7,500 to travel from Omaha, Nebraska, to a supplier in Texas to purchase cocaine. Appellant hid Hill's money, along with $7,500 of his own, underneath the hood of his car, in a manner that he had been taught by Charles Taylor, who was a former boyfriend of Appellant's sister and the father of Appellant's ten-year-old niece, C'Toria. On his way from Omaha to Texas, Appellant stopped in Kansas City and stayed overnight at Mr. Taylor's home at 8044 Michigan Street. When Appellant later arrived in Texas, he discovered that the money was missing from underneath his car hood. Appellant returned to Omaha and informed Hill that their money had been stolen and that he thought Mr. Taylor had taken it. Appellant told Hill that he was going back to Kansas City to retrieve the money.

About 5 a.m. on August 6, 1997, at least two men burst into the Taylor's home. The men were dressed in black, wore gloves, and their faces were covered. They were brandishing flashlights and handguns. C'Toria Taylor was sleeping in the living room along with her two younger brothers, who were 8 and 4, when the men entered the home. When Mr. Taylor appeared from the bedroom, the men yelled out, "Freeze, police!" The men then overpowered Mr. Taylor and took

him into the kitchen. Mr. Taylor's wife, Glendora, was also taken to the kitchen, where both Mr. and Mrs. Taylor were duct-taped to chairs. One of the men returned to the living room to watch the children. A man in the kitchen spoke with Mr. Taylor for five or six minutes. At some point, C'Toria heard the man ask Mr. Taylor where the money was. Shortly thereafter, the gunmen shot Mr. and Mrs. Taylor in the head and left the house with two shoeboxes under their arms. After looking in the kitchen and seeing that her parents were dead, C'Toria gathered up her brothers and went to look for help. A neighbor let the children inside her house and called 911.

Upon arriving at the scene, the police discovered the bodies of Mr. and Mrs. Taylor, both of whom had been shot in the head. Mrs. Taylor was found duct-taped to a chair with the back of her head resting on a kitchen counter. Mr. Taylor was found duct-taped to a chair lying on the floor of the hallway adjacent to the kitchen in a pool of blood.

Less than half a block away, police recovered two pair of gloves, two black scarves and two black stocking caps that had been discarded alongside the street. A saliva stain was later discovered on one of the scarves, and the scarf was sent away for DNA testing.

Police subsequently obtained statements from three different individuals, including Hill, who stated that Appellant had admitted killing Mr. and Mrs. Taylor over drug-money that he thought they had stolen from his car. In October 1997, pursuant to a court order, Detective Marcus Regan of the Kansas City Police Department went to Omaha, Nebraska, to retrieve hair, saliva, and blood samples from Appellant, who was incarcerated in a Nebraska prison. After DNA tests were performed on the saliva stain from the scarf and Appel-

lant's blood, it was determined that the chance that another person other than Appellant left the saliva on the scarf was one in 105 million males in the general population.

Appellant was subsequently charged by indictment with two counts of murder in the first degree and two counts of armed criminal action related to the murders of Mr. and Mrs. Taylor. Appellant was tried by jury in the Circuit Court of Jackson County and found guilty as charged. The jury recommended sentences of life imprisonment without chance for probation or parole on each of the murder counts and life imprisonment on each of the armed criminal action counts. On December 17, 2004, the trial court imposed sentence on Appellant in accordance with the jury's recommendations. Appellant, acting *pro se*, brings eight points on appeal from those convictions.

Because we conclude that discussion of Appellant's Points II through VII would have no precedential value, we will affirm as to those points by summary order pursuant to Rule 30.25(b). We are furnishing the parties a memorandum of the reasons for our decision as to those issues. In this opinion, we address only Appellant's Point I, wherein he generally claims a violation of the Interstate Agreement on Detainers Act ("the IAD"), and Point VIII, where he seeks plain error review of his claim that the verdict directing instructions for murder in the first degree failed to comply with MAI–CR 3d 304.04 by failing to require a finding that Appellant personally deliberated.

In his first point, Appellant claims that the trial court erred in failing to grant his motion to dismiss and in entering its judgment and sentencing him because the case should have been dismissed pursuant to the provisions of the IAD. Appellant contends that a detainer was lodged against

him while he was incarcerated in Nebraska, that Missouri requested and received temporary custody of him to conduct his murder trial, that the State failed to try his case within 120 days, and that the State returned him to Nebraska prior to trying his case. Appellant argues that these latter two actions violated the provisions of the IAD and required dismissal of the case against him. The State concedes that Appellant was transferred between Nebraska and Missouri several times and that he was not tried within 120 days of his original transfer but contends that the provisions of the IAD were inapplicable because Appellant was extradited pursuant to an executive agreement between governors.

■ We review *de novo* the trial court's application of the law in refusing to dismiss the indictments against Appellant under the IAD. *State v. Lybarger,* 165 S.W.3d 180, 184 (Mo.App. W.D.2005). But "[t]o the extent the application of law is based on the evidence presented, we view the facts in a light most favorable to the judgment, giving deference to the trial court's factual findings and credibility determinations." *Id.*

The record reflects the following facts related to the transfers of Appellant between Nebraska and Missouri. On October 28, 1997, a complaint was filed against Appellant, and a warrant was issued for his arrest. On December 3, 1997, Appellant was sentenced in the State of Nebraska, in an unrelated case, to a term of imprisonment of seven to fourteen years. On January 5, 1998, after discovering that Appellant was incarcerated in a penitentiary in Nebraska, a detainer was lodged against Appellant by the Jackson County Prosecutor's office.

On July 24, 1998, the Governor of Missouri and the Governor of Nebraska entered into an "Executive Agreement" to have Appellant returned to Missouri to face the pending charges in Jackson County. The State of Nebraska subsequently filed a "Motion to Transfer Temporary Custody" under the "Executive Agreement on Detainer" in a district court in Nebraska asking the court to order the Nebraska Department of Correctional Services to deliver temporary custody of Appellant to the State of Missouri pursuant to the executive agreement. A hearing was conducted on the motion to transfer custody on August 18, 1998. At that hearing, defendant and his attorney agreed to waive his right to challenge his transfer to the State of Missouri. The court ordered Appellant transferred to the State of Missouri pursuant to the executive agreement.

Appellant was transferred into Missouri custody on September 14, 1998. On October 6, 1998, Appellant was charged by indictment with two counts of murder in the first degree and two counts of armed criminal action related to the deaths of Mr. and Mrs. Taylor.

On January 25, 2000, Appellant filed a Motion for Emergency Trial Setting. In that motion, Appellant acknowledged that he had previously signed a waiver of extradition to be returned to Missouri. The motion averred that on December 23, 1999, counsel for Appellant and the prosecuting attorney had agreed to continue the case and that Appellant would be returned to the State of Nebraska. Appellant requested the emergency trial setting because he had not yet been transferred back to Nebraska. On March 10, 2000, the State dismissed its indictment against Appellant.[1] Appellant was returned to the Nebraska Department of Correctional Services on March 22, 2000. The Nebraska

---

1. The reason stated in its dismissal was that witnesses were not available for trial.

Department of Correctional Services subsequently cancelled the detainer against Appellant on February 22, 2001.

On September 19, 2000, a Closed Re-Indictment was filed in Missouri against Appellant again charging him with two counts of murder in the first degree and two counts of armed criminal action related to the killings of Mr. and Mrs. Taylor. On May 20, 2001, the Governor of Missouri sent a "Requisition Demand and Agent Authorization" to the Governor of Nebraska requesting apprehension and delivery of Appellant to the State of Missouri "pursuant to the provisions of the Constitution and laws of the United States and of the State of Missouri, Chapter 548, RSMo.1994 and the State of Nebraska." On July 1, 2002, the Governor of Nebraska and the Governor of Missouri entered into a second Executive Agreement to transfer Appellant to the State of Missouri to face the charges against him. Appellant was subsequently transferred back into Missouri custody.

On March 14, 2003, Appellant filed a Motion to Dismiss pursuant to the IAD alleging that the State had failed to commence trial within the 120-day time period allowed by the IAD, averring that he had been transferred back to Missouri on September 19, 2002, and that the case against him should be dismissed. On May 13, 2003, the State again voluntarily dismissed the indictment against Appellant without prejudice before the trial court ruled on Appellant's motion.[2] Appellant was again returned to the Nebraska Department of Correctional Services, where he remained until he was released on parole.

On February 9, 2004, a complaint was filed charging Appellant with two counts of murder in the first degree and two counts

of armed criminal action related to the killing of Mr. and Mrs. Taylor. Appellant surrendered to Jackson County authorities. Appellant subsequently filed a Motion to Quash, an Application for Writ of Habeas Corpus, and a Motion to Dismiss, all of which asserted that the case against him should be dismissed based upon alleged violations of the IAD. The trial court denied all of those motions, finding that Appellant's transfers were not effectuated under the IAD. Appellant was tried by jury beginning on September 13, 2004.

On appeal, Appellant contends that the IAD was applicable and that the trial court erred in denying his motion to dismiss the charges against him based upon violations of the 120-day provision and the anti-shuttling provision contained in the IAD. In response, the State argues that the trial court properly found that the IAD was not implicated and that Appellant's transfers between Nebraska and Missouri were made pursuant to the extradition statutes.

■ "The IAD is a congressionally sanctioned interstate compact subject to federal construction." *Lancaster v. Stubblefield,* 985 S.W.2d 854, 855 (Mo.App. E.D.1998). "The state of Missouri adopted the IAD and it is codified at § 217.490." *Rivera v. State,* 106 S.W.3d 635, 639 (Mo. App. S.D.2003). "The IAD applies to prisoners incarcerated in another jurisdiction who have untried Missouri charges and are subject to detainers originating in Missouri." *State v. Vinson,* 182 S.W.3d 709, 711 (Mo.App. E.D.2006). A detainer is "a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different

---

2. The reason for the dismissal was stated to be that the current evidence was not sufficient to prove guilt.

crime." *Alabama v. Bozeman*, 533 U.S. 146, 148, 121 S.Ct. 2079, 2082, 150 L.Ed.2d 188 (2001). "The IAD 'is designed to encourage the expeditious and orderly disposition of charges outstanding against a prisoner and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints.'" *Lancaster*, 985 S.W.2d at 855 (quoting *United States v. Mauro*, 436 U.S. 340, 343, 98 S.Ct. 1834, 1839, 56 L.Ed.2d 329 (1978)). "The primary purpose of the agreement is to provide for prompt disposition of detainers, and it must be liberally construed to effectuate this purpose." [3] *Lybarger*, 165 S.W.3d at 184.

Under the IAD, there are two ways in which the defendant may be delivered into the custody of the state lodging the detainer for disposition of the charges against him. Article III of the IAD provides that the defendant may request, in writing, disposition of the charges against him. § 217.490, Art. III(1).[4] Appellant never requested disposition of the charges against him and, therefore, the provisions of Article III are not applicable to the case at bar.

Appellant instead relies upon the provisions of Article IV of the IAD. Article IV provides:

> The appropriate officers of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with paragraph 1 of article V of this agreement upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided that the court having jurisdiction of the indictment, information or complaint shall have duly approved, recorded and transmitted the request; and provided further that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

§ 217.490, Art. IV(1). Article IV goes on to provide:

> In respect of any proceeding made possible by this article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

§ 217.490, Art. IV(3). Article IV of the IAD also contains an "anti-shuttling" provision, which provides:

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to paragraph 5 of article V of this agreement, such indictment,

---

**3.** "The IAD was created, in part, because of evidence indicating that, once a detainer is lodged against an inmate, the inmate's status within the prison changes adversely." *State v. Robertson*, 182 S.W.3d 747, 753 (Mo.App. W.D.2006). "Further, in order for rehabilitation and treatment programs to be planned and carried out, untried charges must be disposed of by trial or dismissal within a reason-able period of time." *Id.* "Finally, the state and society have a strong interest in having pending charges tried in a timely fashion." *Id.*

**4.** Such a request is deemed to be a waiver of extradition to the state lodging the detainer. § 217.490, Art. III(5).

information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

§ 217.490, Art. IV(5). Appellant contends that both of these provisions of the IAD were violated by the State in this case.

In response, the State argues that Appellant's transfers between Nebraska and Missouri were effectuated through an extradition agreement between the respective governors rather than under the provisions of the IAD and, further, that Appellant effectively waived any rights he may have had under the IAD.

■ The IAD is not the exclusive means of securing custody of an out-of-state prisoner for disposition of the charges pending against him in this State. *See Commonwealth v. Wilson,* 399 Mass. 455, 504 N.E.2d 1060, 1064 (1987); *People v. Quackenbush,* 687 P.2d 448, 450 (Colo. 1984); *State v. Hall,* 976 S.W.2d 121, 171–72 (Tenn.1998); *Mauro,* 436 U.S. at 364 n. 30, 98 S.Ct. at 1849 n. 30 (noting that the legislative history of the IAD indicates that it was not meant to be the exclusive means of effecting transfer of a prisoner for purposes of prosecution). "[A] state retains its constitutional and statutory rights to extradite a fugitive from another state" and, accordingly, may choose to acquire custody of a defendant incarcerated in another state either through formal extradition or through the IAD. *Hall,* 976 S.W.2d at 172.[5]

Missouri's extradition statute, § 548.051, provides:

When it is desired to have returned to this state a person charged in this state with a crime, and such person is imprisoned or is held under criminal proceed-

ings then pending against him in another state, the governor of this state may agree with the executive authority of such other state for the extradition of such person before the conclusion of such proceedings or his term of sentence in such other state, upon condition that such person be returned to such other state at the expense of this state as soon as the prosecution in this state is terminated.

Both executive agreements between the respective governors reference the statutory and constitutional authority of the respective governors to effect extradition of Appellant and specifically state that Appellant is to be extradited from Nebraska to Missouri. Thus, these agreements were formed pursuant to the respective governors' extradition authority. However, the agreements do contain a paragraph stating: "This Agreement shall constitute a detainer lodged against MAURICE T. DAVIS and formal extradition will not be required to effect any of his transfers made in accordance with this agreement."

■ The question before this Court, then, is whether the executive agreements constituted a "request" for temporary custody under the IAD so as to inadvertently trigger its provisions. We conclude that they do not based on the plain language of Article IV of the IAD.

If there is an indictment, information or complaint pending in Missouri against a person incarcerated in another state, Article IV authorizes appropriate officers in Missouri to lodge a detainer against that defendant and entitles Missouri to have the defendant made available upon presentation of a written request for temporary custody. However, Missouri's entitlement

---

**5.** In *State v. Hall,* 976 S.W.2d 121, 171–72 (Tenn.1998), the Tennessee Supreme Court held that the State could withdraw its request that the defendant be returned to Tennessee under the IAD and bring the defendant to Tennessee via extradition instead.

to temporary custody is dependent upon its request for temporary custody having been *"duly approved, recorded and transmitted"* by the *"court having jurisdiction of the indictment, information or complaint."* § 217.490, Art. IV(1) (emphasis added). The record in this case does not reflect, nor does Appellant contend, that the executive agreements were ever approved, recorded, and transmitted by the court having such jurisdiction. Thus, the executive agreements cannot be deemed to be requests under Article IV.

This conclusion is supported by the only other case to have addressed a similar issue, *Commonwealth v. Wilson,* 399 Mass. 455, 504 N.E.2d 1060, 1064 (1987), in which an agreement reached under extradition statutes by the Governors of Massachusetts and New Hampshire after a detainer had been filed was held not to constitute a request for temporary custody under the IAD.[6] In *Wilson,* the court began by noting that "[i]t is clear that the provisions of [Article IV of the IAD] are triggered only when a 'detainer' is filed with the sending State by the receiving State having untried charges pending against the prisoner *and* the receiving State files an appropriate 'request' for temporary custody in the sending state." 504 N.E.2d at 1063 (emphasis in original). Relying on the fact that the IAD required that such a request be "duly approved, recorded, and transmitted" by the court having jurisdiction over the indictment, information, or complaint, the court held that the executive agreements entered into by the Governors of Massachusetts and New Hampshire could

not be deemed to be "requests" under the IAD. *Id.* at 1064–65.

Thus, the same language and interpretation of Article IV that we find dispositive of Appellant's Point I was found controlling in the only other case that has addressed the identical issue. Accordingly, the executive agreements entered into by the Governors of Missouri and Nebraska in this case cannot be deemed to be "requests" under Article IV of the IAD. Point I is denied.

In his final point, Appellant argues that the trial court erred in submitting verdict directing instructions for murder in the first degree (Instructions # 10 and 12) that failed to comply with MAI–CR 3d 304.04 by failing to require a finding that he personally had deliberated upon the murders. Appellant concedes that this claim of error is not preserved for appellate review because he failed to make a proper objection to the instructions at trial but he asks this court to review for plain error.

■ "Plain error is only found where the alleged instructional error demonstrates on its face substantial grounds for believing that manifest injustice or miscarriage of justice has occurred." *State v. Biggs,* 170 S.W.3d 498, 503 (Mo.App. W.D. 2005). "Instructional error, even if clear and obvious, is rarely found to result in manifest injustice or a miscarriage of justice, requiring reversal for plain error." *State v. January,* 176 S.W.3d 187, 193 (Mo.App. W.D.2005). "To establish that the instructional error rose to the level of plain error, appellant must demonstrate

---

**6.** The State cites *People v. Quackenbush,* 687 P.2d 448, 451 (Colo.1984), and *State v. Roberson,* 78 Wash.App. 600, 897 P.2d 443, 445 (1995), for this proposition, but in both of those cases, no detainer was filed, and the issue before the court was whether the extradition agreement constituted a detainer. In the remaining case cited by the State on this issue, *Ex Parte Percy Wayne Froman,* 2002 WL 31319456, 2002 Tex.App. LEXIS 7436 (2002), the defendant's IAD claims were rejected simply because the argument was not sufficiently developed on appeal, and the merits of the defendant's claim were, therefore, not addressed.

that the trial court so misdirected or failed to instruct the jury that it is evident the instructional error affected the jury's verdict." *State v. Deck,* 136 S.W.3d 481, 486 (Mo. banc 2004) (reversed on other grounds in *Deck v. Missouri,* 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005)).

Verdict directing instruction # 10, which was submitted to the jury, stated:

> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
>
>> First, that on or about August 6, 1997, in the County of Jackson, State of Missouri, the defendant or other persons caused the death of Charles E. Taylor by shooting him, and
>>
>> Second, that defendant or other persons knew or was aware that his conduct was practically certain to cause the death of Charles E. Taylor, and
>>
>> Third, that defendant or others did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,
>
> Then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:
>
>> Fourth, that with the purpose of promoting or furthering the commission of that murder in the first degree, the defendant acted together with or aided other persons in committing the offense,
>
> then you will find the defendant guilty under Count I of murder in the first degree.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Instruction # 12 was identical to Instruction # 10 except for the substitution of Glendora J. Taylor as the victim and the numbering of the count as Count III. These verdict directing instructions were patterned after MAI–CR 3d 313.02.

The notes on use for MAI–CR 3d 304.04, however, state:

> [M]urder in the first degree requires "deliberation"—a mental state not found in any other crime. It is possible for the accessory to have the purpose to promote a murder by aiding another person without necessarily having "deliberated." To make it clear that to be guilty of murder in the first degree the defendant must have deliberated, the verdict director must require a finding of that element.

> \* \* \*

> If in using MAI–CR 3d 304.04 in setting out the essential elements of the offense this element is ascribed to the defendant alone or to the defendant *and* the other person or persons, the requirement of finding the defendant "deliberated" is satisfied. If, however, in the first listing of the elements, the element of deliberation is not so ascribed to the defendant (as would be the case where the defendant did not perform any conduct that caused the death and the defendant's liability is based solely on his aiding the person who caused the death), or if the element of deliberation is ascribed to "the defendant *or* another person," then the ascription of deliberation to the defendant should be accomplished by modifying the paragraph following "then you are instructed that the offense of [name of offense] has occurred . . . ." to read as follows:
>
>> (Second) (Third) ( [next numbered paragraph] ), that with the purpose of promoting or furthering the death of

[name of victim], the defendant aided or encouraged [name(s) of other person(s) involved or, if unknown, a general identification of the other(s) involved, such as "another person," "other person(s)," etc.] in causing the death of [name of victim] and did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

Such a modification makes clear that the jury must find that the defendant did deliberate.

MAI–CR 3d 304.04, Notes on Use 7(b) (emphasis omitted).

■ "Our Supreme Court has held that the verdict-directing instruction for first-degree murder 'must ascribe the element of deliberation to the defendant specifically, even though the charge is premised on accessory liability.'" *State v. Busch,* 920 S.W.2d 565, 569 (Mo.App. E.D. 1996) (quoting *State v. Ferguson,* 887 S.W.2d 585, 587 (Mo. banc 1994)). "Although the conduct of a defendant may be imputed to a codefendant, the element of deliberation may not." *Ferguson,* 887 S.W.2d at 587. Since the verdict directing instructions in the case at bar were submitted in the disjunctive form of "the defendant or others," the verdict director would allow the jury to find the element of deliberation without believing that Appellant had himself deliberated, and this constitutes error. *Busch,* 920 S.W.2d at 569.

■ While the State acknowledges that the instructions given did not comply with the MAI–CR notes on use and concedes that this shortcoming constituted error, the State contends that any prejudice arising from this error does not rise to the level of manifest injustice or miscarriage of justice. "To show that the trial court 'plainly erred' in submitting a jury instruction, a defendant 'must go beyond a demonstration of mere prejudice'" and "must

establish that the trial judge so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice." *State v. Cates,* 3 S.W.3d 369, 372 (Mo.App. S.D.1999) (quoting *State v. Davidson,* 941 S.W.2d 732, 736 (Mo.App. E.D.1997)).

■ Under the facts and circumstances presented, we find no manifest injustice or miscarriage of justice resulted from the erroneously submitted instruction. The instructions given required the jury to find beyond a reasonable doubt that "with the purpose of promoting or furthering the commission of that murder in the first degree, the [Appellant] acted together with or aided other persons in committing the offense." While Appellant argues that the jury could have found that the other person or persons involved in the shootings deliberated but that he did not, such a conclusion defies belief. Appellant's defense at trial was that he was not involved in the crime, and he made no effort to challenge the evidence of deliberation on the part of the assailants. The record clearly establishes that the victims were tightly bound to chairs and that they were executed after being questioned by their assailants. These facts leave no doubt that the shootings occurred after cool reflection upon the matter for at least a brief period of time. Nothing in the record indicates that any of the assailants participated in the murders without deliberating. Accordingly, there is no reason to believe that the error in the instructions had any effect on the jury's verdict. *See Busch,* 920 S.W.2d at 569–70 (finding no manifest injustice or miscarriage of justice in submission of first-degree murder instruction without requiring a finding that the defendant deliberated where the defendant did not dispute the evidence of deliberation and, under the evidence, it was unreasonable to think the jury could

have found the defendant participated in the murders without deliberating). Absent any indication of manifest injustice or miscarriage of justice resulting from the submission of the erroneous instruction, we find no plain error. Point denied.

The judgments of conviction and the sentences in this case are affirmed. A memorandum discussing the points not covered in this opinion has been furnished to the parties pursuant to Rule 30.25(b).

All concur.