UNITED STATES of America, Appellee,

v.

Dale Scott HUNNEWELL,
Defendant, Appellant.

No. 89–1177.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1989.

Decided Dec. 14, 1989.

Steven A. Feldman, New York City, with whom Feldman and Feldman was on brief, for defendant, appellant.

Jonathan R. Chapman, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., were on brief, for U.S.

Before BOWNES, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Defendant-appellant Dale Scott Hunnewell was indicted for, and convicted of, drug trafficking offenses. *See* 21 U.S.C. §§ 841(a)(1); 841(b)(1)(C); 18 U.S.C. § 2. His appellate counsel looses a torrent comprising eight thundersqualls of assigned error. We find the downpour insufficient to wash out the convictions.

## I

■ As to six of the cloudbursts, we can swiftly clear the air. First, Hunnewell's assertion that he was deprived of proficient representation below is premature at best. The rule in this circuit is that a fact-specific claim of ineffective legal assistance cannot be raised initially on direct review of a criminal conviction, but must originally be presented to the district court. *United States v. Costa*, 890 F.2d 480, 482–83, (1st Cir.1989); *United States v. Carter*, 815 F.2d 827, 829 (1st Cir.1987); *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir. 1983). In this case, the claim was not pressed below and the record is too exiguous to permit us to make an informed judgment on it. We therefore reject it as unripe.[1]

Of the remaining seven arguments, five strike us as having evaporated under the hot glare of procedural default. We discuss them in the ensemble, seeing little to be gained by exegetic narration of the underlying facts and/or legal theories. We then proceed to the nondefaulted claims, erecting needed factual scaffolds in the context of our discussion of particular issues.

## II

Hunnewell contends that the prosecutor's closing argument impermissibly injected personal opinion into the case; and that four different kinds of errors were committed in regard to the admission of evidence and examination of witnesses. But, in none of these instances was a timely objection proffered. In *United States v. Griffin*, 818 F.2d 97 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987), we dealt with a very similar situation:

> The governing precepts are straightforward and unambiguous. In general, error may not be predicated upon rulings admitting or excluding evidence, Fed.R. Evid. 103 ... unless the party putatively aggrieved makes his complaint known to

the trial court in due season, thus preserving his rights.... If a party shirks this duty ... he forfeits much of his opportunity thereafter to complain about ensuing mistakes. Such points can be reviewed on appeal only for the existence of what courts have come to term "plain error."

*Id.* at 99–100. *Griffin* applied the same principle to a claim, not the subject of a contemporaneous objection, that the prosecutor's summation went too far. *See id.* at 99 n. 1. *See also United States v. Mejia–Lozano*, 829 F.2d 268, 272 (1st Cir.1987).

The plain error hurdle is high. *See, e.g., United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (plain errors are limited to those which "undermine the fundamental fairness of the trial"); *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) (plain errors are restricted to those which "are obvious, or ... seriously affect the fairness, integrity or public reputation of judicial proceedings"). It follows, unsurprisingly, that the plain error exception is to be used "sparingly," only to prevent justice from miscarrying. *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982). Inasmuch as plain error "gives a defendant a free second bite at the cherry, [it] is to be narrowly limited." *United States v. Rivera*, 872 F.2d 507, 509 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989).

■ When we evaluate appellant's procedurally defaulted claims against so rigorous a standard, they cannot pass muster. The parts of the prosecutor's summation which appellant assails (*e.g.*, "[Hunnewell] got caught red-handed;" "in this case ... the evidence points to Dale Hunnewell") seem to us to comprise unexceptionable statements of fact rather than forbidden expressions of personal belief. That these remarks may have displeased Hunnewell is beside the point; a prosecuting attorney

---

**1.** In declining to reach the merits of the claimed inadequacy of representation, we neither foreclose, nor take any view of, a subsequent petition in the district court under 28 U.S.C. § 2255 predicated on this ground.

must refrain from striking foul blows, but he can nevertheless strike forceful ones. The prosecutor need not wrap every word in a soft cloak of antiseptic neutrality.

The evidentiary rulings, by and large, seem likewise within the pale. We see no profit in rehearsing the details. The areas of dispute are pedestrian and peripheral, not portentous and pivotal. Without exception, the assigned errors involve, at worst, the "ordinary backfires ... which may mar a trial record," rather than the "blockbusters" needed to overcome the lack of contemporaneous objections. *See Griffin*, 818 F.2d at 100. Moreover, having examined each of the challenged rulings in context, we are hard pressed to fault the presider; the determinations seem likely correct (or at least, within the trier's discretion). We have grave difficulty spying even a sprinkling of error—let alone error so teeming as to be termed "plain."

In fine, there is nothing in the summation or in the district court's evidentiary rulings which supports the notion that the claimed shortcomings, singly or in combination, "seriously affect[ed] the fundamental fairness and basic integrity of the proceedings conducted below." *Id.* Plain error being plainly absent, our consideration of these initiatives terminates.

### III

We pass next to defendant's principal ground of appeal, a multifaceted grievance which implicates compliance *vel non* with the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. pp. 585–91. Although the IAD initiative was properly preserved for appellate scrutiny, we find it unmeritorious in its several permutations.

Many of the pertinent facts are undisputed. The last month of 1987 was eventful for Hunnewell. On December 11, he was found guilty of drug trafficking in Maine Superior Court, sentenced to a 10–year prison term, and released on bail pending appeal. On December 16, he was indicted by a state grand jury on neoteric trafficking charges. A day later, a federal grand jury handed up the instant indictment. On December 19, a state judge revoked bail, and Hunnewell was taken into state custody. After a brief, temporary detention at the Cumberland County Jail (CCJ), state authorities moved him to the Maine State Prison in Thomaston (MSP–Thomaston). He began serving his 10–year sentence there. Subsequently, the United States Attorney lodged a detainer and request for temporary custody pursuant to the IAD.

On February 19, 1988, the warden of MSP–Thomaston turned Hunnewell over to federal marshals, acting in furtherance of the detainer.[2] The marshals brought the defendant to federal district court, Portland, on the same day. After arraignment, the district court remanded Hunnewell to the marshals' custody. Because Maine has no federal prison, and Hunnewell was subject to pretrial detention, his trial counsel asked that he be housed at CCJ (a facility located hard by the federal courthouse). The government objected, citing *inter alia* security considerations. The district court refused to order that Hunnewell be held at CCJ, and the marshals returned him to MSP–Thomaston that very day.

Apart from federal court appearances, Hunnewell remained at MSP–Thomaston until he was sentenced on the federal charges. There was, however, one exception: on March 18, 1988, he was transported by county sheriffs, acting under a state writ of habeas corpus, to superior court for arraignment on a new state charge of trafficking in prison contraband (a charge which grew out of defendant's ongoing incarceration at MSP–Thomaston). Because counsel failed to appear, the arraignment was adjourned and, apparently, not rescheduled during the interval with which we are concerned.

### A

■ Appellant filed a pretrial motion to dismiss the federal indictment, contending

---

2. There is some evidence that Hunnewell was taken from the penitentiary by state or county officers on two occasions before February 19.

Any such excursions are immaterial for the purpose at hand.

that, even after February 19, he was held at MSP–Thomaston in state, not federal, custody, thus violating the IAD and requiring that the federal indictment be dismissed with prejudice.[3] In Hunnewell's view, that he remained at MSP–Thomaston, and was taken so easily by county sheriffs on March 18 for a nonfederal purpose, proved his point. The government argued to the contrary, adverting to (1) the practice, commonplace in Maine, of housing federal pretrial detainees at state correctional facilities, (2) the district judge's unambiguous order remanding the prisoner to federal safekeeping, and (3) a letter from the United States Attorney to the warden (dated February 25) confirming that Hunnewell was being held in the marshals' custody while at MSP–Thomaston.

After an evidentiary hearing, the district court filed a rescript denying the motion. Noting that the United States Marshals' Service paid board for Hunnewell at MSP–Thomaston from February 19 forward, the court found that Hunnewell "was not returned to state custody when he went back to Thomaston; following the February 19 arraignment, he remained in federal custody while at the State Prison." Given the evidence of record, we believe the finding to be well supported. We must accept it.

The finding, in turn, draws the grease from the goose. The IAD was designed to achieve two interrelated ends: (1) to dispel the miasma of uncertainty enveloping persons already incarcerated when untried charges hovered over them; and (2) to inhibit the retardation of a prisoner's institutional care and rehabilitation which all too often arises when he is cavalierly bandied between prosecuting authorities on account of pending charges. *See IAD,* Art. I; *see also United States v. Mauro,* 436 U.S. 340, 349–51, 359–61, 98 S.Ct. 1834, 1841–42, 1846–48, 56 L.Ed.2d 329 (1978); *Crooker v. United States,* 814 F.2d 75, 77 (1st Cir. 1987). To alleviate these evils, the IAD's antishuttling provision, quoted *supra* note

3, ensures that, once the receiving government obtains custody of the prisoner, it will try him before returning him to the sending government's stewardship. *See United States v. Roy,* 771 F.2d 54, 55 (2d Cir. 1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986). And, the IAD requires that such a trial be held expeditiously. *See IAD,* Arts. IV(c), V(c); *see generally United States v. Taylor,* 861 F.2d 316 (1st Cir.1988) (discussing timeliness requirements).

In this case, time is not the issue; appellant concedes that, after the initial federal intervention, he was brought to trial on the federal charges with the alacrity which the IAD demands. Rather, his protest focuses on being physically returned to MSP–Thomaston subsequent to his arraignment in federal district court. We think the complaint is unavailing.

The IAD applies to defendants in custody only after they have entered into the lifestyle and routine of the penal institution. *Crooker,* 814 F.2d at 77–78. What triggers the interstate compact at that point is the concern for "adverse effects on the rehabilitation of prisoners" which might otherwise result. *Taylor,* 861 F.2d at 318. Because the IAD is ameliorative, it ought to be construed as such. When the receiving government takes custody of the prisoner, yet elects to retain him *in situ,* the IAD's legitimate goal is furthered, not thwarted. In such circumstances, the change in custodial responsibility works the absolute minimum amount of dislocation. Keeping an already-incarcerated person in his familiar surroundings is consonant with, not at variance from, what the IAD was intended to accomplish.

The Court has instructed that the IAD must be read in the context of its underlying objectives. *Mauro,* 436 U.S. at 349, 98 S.Ct. at 1841. Just as those objectives "are fully satisfied by allowing the federal government to return a state prisoner to

---

**3.** Article IV(e) of the IAD provides in material part:

> If trial is not had on any indictment ... contemplated hereby prior to the prisoner's being returned to the original place of imprisonment ..., such indictment ... shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

his original place of imprisonment [in state custody]" after brief detention for federal arraignment, *Taylor*, 861 F.2d at 319, so they are satisfied by retaining the newly-arraigned individual in federal custody but at his state-selected place of incarceration pending prompt disposition of the federal charges. It would make absolutely no sense to construe the IAD as *discouraging* the maintenance of a stable environment for an affected convict—and we decline appellant's invitation that we do so. Such a holding would accomplish nothing worthwhile—and at the same time, would needlessly frustrate a core purpose of the IAD. We rule that, so long as custodial responsibility actually shifts and applicable temporal limits are observed, retention of the prisoner in the same institutional setting cannot signify that he was "returned to [his] original place of imprisonment" within the meaning of Article IV(e) of the IAD. *Accord Shigemura v. United States*, 726 F.2d 380, 381 (8th Cir.1984) (per curiam) (housing federal prisoner at local jail where original state sentence was being served did not transgress IAD's anti-shuttling provisions); *cf. United States v. Persinger*, 562 F.Supp. 557, 561–62 (W.D.Pa.1982) (judicial order requiring federal custody is self-executing as to prisoner's custody status and is unimpaired by marshals' return of prisoner to county jail). The fact that Hunnewell was immured at MSP–Thomaston as both a federal prisoner and a state prisoner was, legally, an irrelevant coincidence for purposes of the IAD.

Appellant's second asseveration is equally unavailing; we cannot say that the IAD was infracted when, on March 18, the state's writ of habeas corpus was honored and Hunnewell was taken to superior court. *Taylor* controls. There, the defendant was in custody as a state prisoner. He was brought to federal court, arraigned on federal charges, and then immediately returned to the same state jail, still in state custody. We held that the IAD had not been abridged. 861 F.2d at 319. Judge Coffin wrote:

> Undoubtedly, the requirement that a prisoner be tried before being returned to his original jurisdiction primarily was

designed to avoid the shuttling of prisoners back and forth between institutions in different states or in distant parts of the same state. It makes no sense to interpret the provision to prevent the federal government from returning a prisoner *on the same day* to a state institution located across town after a brief proceeding. So long as the charges against a prisoner are resolved within the time limits provided by the IAD, the purposes of the Agreement are fully satisfied by allowing the federal government to return a state prisoner to his original place of imprisonment after one brief detention for a federal arraignment or other proceeding.

*Id.* Although the sending and receiving governments are postured differently in this case (county officials having taken defendant briefly and returned him promptly to federal custody), we find the *Taylor* court's rationale to be fully apposite. There was no IAD violation.

### B

The thundershower or two which remain in the IAD firmament need not detain us long. Hunnewell argues that MSP–Thomaston was too remote to permit preparation of his defense. The claim—which, although garbed by appellant in the raiment of the IAD, has nothing to do with the interstate compact—is belied by the record. The district court ruled, supportably, that housing defendant somewhere besides MSP–Thomaston would, given security considerations, have made it "more difficult," not less difficult, for counsel to communicate with him. Hunnewell has offered us no convincing reason to secondguess the trier on this finding of fact.

■ Appellant also complains that he was denied an in-prison job and other rehabilitation. Yet, the IAD is designed to preserve the *opportunity* to benefit from what prison life has to offer, not to ensure that rehabilitative programs are actually undertaken. Once the receiving government has taken custody, the IAD commands (1) that the government refrain from shuttling the prisoner about, and (2)

that the detainee be brought quickly to trial. The compact does not require that the prisoner be placed, or allowed to continue, in particular activities. For IAD purposes, it does "not matter whether appellant was in fact able to begin a rehabilitation program." *Taylor*, 861 F.2d at 320.

C

We mop up briefly. Neither the fact that federal officials elected to hold Hunnewell in federal custody at MSP–Thomaston, nor the fact that he was taken to state court during the period of his federal custody (and returned on the same day), nor any of the other matters brought to our attention, posed the tiniest threat to Hunnewell's rehabilitation or created impermissible uncertainty. Consequently, we uphold the district court's ruling that the IAD was honored.

IV

■ We come now to a properly preserved objection relating to the presence of a cartoon in the jury room. We reproduce the cartoon and proceed to canvass the salient facts.

"The bad news is that we find the defendant guilty, Your Honor. The good news is that I've become engaged to Miss Hotchkiss, here."

On the second trial day, a juror gave the offending cartoon to a court officer, suggesting that the judge "might enjoy it." The juror was wrong. The judge notified

counsel of the occurrence, solicited their views, reserved decision on defendant's motion for mistrial, and adjourned for the day. The next morning, the judge told the lawyers that a voir dire would be conducted. Possible lines of questioning were discussed. The jury was brought to the courtroom and the judge explained the procedure that would take place. Each juror was then questioned by the judge out of earshot of the others, and counsel were offered the opportunity to interrogate each juror.

There were fourteen jurors in all (including two alternates). During the individual voir dire, eight jurors stated that they had neither viewed the cartoon nor heard any conversation about it. The six who had seen the pasquinade denied that it connoted anything with respect to Hunnewell's case; all disclaimed having prematurely resolved any questions of fact; all vowed open-mindedness about the case on trial; and all emphatically assured continuing impartiality. When the survey was over, defense counsel renewed his motion. The court refused to grant a mistrial, voicing its satisfaction with the panel. The court stated "that there is no basis to conclude, even intimate, this cartoon has affected the view of any juror in this case with respect to their [sic] obligations to consider the evidence and to render a verdict in accordance with the instructions of the Court."

At the threshold, we reject defendant's contention that the cartoon was so inherently obnoxious that, without more, a mistrial should have been granted. To be sure, the cartoon had no legitimate place in the jury room. It bespoke a certain insensitivity to the solemnity of the judicial process. Arguably, the clipping was prejudicial. But, realistically, it strains credulity to assume that the cartoon's mere existence irretrievably poisoned the well. The cartoon made no direct reference to the defendant or the case on trial. It did not communicate facts better hidden, inflame the senses, incite baser passions, or appeal to, say, racial or religious prejudice. The cartoon's relationship to Hunnewell's case—if one can be contrived—seems inef-

fable.[4]  Mere exposure to the cartoon, in our judgment, did not so contaminate the jury that a fair trial automatically became an impossibility.  *Cf., e.g., United States v. Nazzaro*, 889 F.2d 1158, 1167–68 (1st Cir. 1989) (newspaper articles concerning other police officers' convictions on different charges not presumptively prejudicial as to ongoing trial of police officer defendant); *United States v. Maceo*, 873 F.2d 1, 6 (1st Cir.) (newspaper story discussing drug raids against Hispanics within district not presumptively prejudicial vis-a-vis Hispanic defendant in ongoing narcotics prosecution), *cert. denied*, — U.S. —, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989).

That is not to say that the cartoon's appearance was irrelevant, or could lightly be ignored.  The judge treated its emergence as a serious matter—and we commend him for doing so.  *See United States v. Anello*, 765 F.2d 253, 258–59 (1st Cir.) (when plausible allegation of juror misconduct is made, trial court must investigate to ascertain whether the misconduct actually occurred, and if so, to assess the effect), *cert. denied*, 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985).  Having decided to investigate, however, the court possessed considerable leeway in determining when and how to interrogate the venire.  *Nazzaro*, 889 F.2d at 1167; *Anello*, 765 F.2d at 259.  And the trial judge's ensuing determination that the jury had not been soured deserves great respect: such a determination should not be disturbed in the absence of a patent abuse of discretion.  *United States v. Webster*, 750 F.2d 307, 336–39 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 855, 856 (1985); *United States v. Kelly*, 722 F.2d 873, 881–82 (1st Cir.1983), *cert. denied*, 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984).

We see no abuse of the court's power here.  The voir dire inquiry was a textbook model:  prompt, careful, searching, and thorough.  Counsel were consulted at critical junctures along the way, and were afforded the chance to guide the questioning and participate fully in it.  From a procedural viewpoint, the probe met all of the benchmarks suggested by the relevant caselaw.  *See, e.g., Tavares v. Holbrook*, 779 F.2d 1, 2–3 (1st Cir.1985); *Anello*, 765 F.2d at 258–59; *United States v. Richman*, 600 F.2d 286, 295–96 (1st Cir.1979).  Indeed, we think it noteworthy that Hunnewell's appellate counsel, despite the vitriolic diatribe which he looses, does not offer any recommendation as to how the voir dire might have been improved.  Nor can the court's ultimate conclusion easily be set aside.  Less than half the jurors were aware of the cartoon at all; no juror associated the cartoon with the case, or believed that his or her ability to render an impartial verdict had been compromised;  on its face, the cartoon possessed no necessary biasing or inflammatory effect.  Under the circumstances, it was well within the trial court's sound discretion to credit the jurors' disclaimers and deny defendant's renewed motion for a mistrial.[5]

### V

We need go no further.  From aught that appears, Hunnewell was fairly tried and justly convicted.  The deluge which his counsel promised has proven by our pluviometer to be little more than a trickle.

*Affirmed.*

---

4.  Hunnewell's trial counsel offered a seemingly accurate appraisal of the situation when he told the district court that "[t]here could be a hundred [different] inferences as to what [the cartoon] means" in the context of the case on trial.

5.  The court gave the jury stock instructions about avoiding reliance on extra-judicial materials at the beginning of the trial, at various points during the trial, and in the charge.  The prosecutor asked the court to consider giving a special instruction when the cartoon incident came to light, but defense counsel demurred.  The court cannot be faulted for handling that aspect of the matter as defense counsel urged.