**STATE of Missouri, Respondent,**

v.

**Thomas S. ROBERTSON, Appellant.**

**No. WD 64367.**

Missouri Court of Appeals,
Western District.

Jan. 31, 2006.

748

Nancy A. McKerrow, Columbia, MO, for Appellant.

Shaun J. Mackelprang, Jefferson City, MO, for Respondent.

Before ROBERT G. ULRICH, P.J., PATRICIA A. BRECKENRIDGE and JAMES M. SMART, JJ.

ROBERT G. ULRICH, Presiding Judge.

Thomas Robertson appeals his conviction following a jury trial of murder in the first-degree, section 565.020,[1] and sentence as a prior and persistent offender to life imprisonment without opportunity for probation or parole. Mr. Robertson presents two points on appeal. In his first point, Mr. Robertson contends the trial court erred in overruling his Motion to Dismiss pursuant to section 217.490. In his second point, Mr. Robertson contends the trial court plainly erred in giving Instruction No. 6, the verdict director for murder in the second-degree. Mr. Robertson's points are denied, and the judgment of conviction is affirmed.

## Facts

In early 1998, Mr. Robertson moved into Kathy Styles' second floor apartment in Clay County, Missouri, with her and her nine-year-old daughter Shauna. On the morning of May 29, 1998, Shauna attempted to wake her mother and discovered her mother was dead. It was later determined that Ms. Styles was murdered by strangulation. The police arrived and determined that both Mr. Robertson and Ms. Style's vehicle were missing. The Clay County prosecutor charged Mr. Robertson with Ms. Styles' murder and learned that he was incarcerated in Texas. The prosecutor effected Mr. Robertson's appearance in Missouri pursuant to the Interstate Agreement on Detainers (IAD), section 217.490 RSMo.

Prior to trial, Mr. Robertson filed a Motion to Dismiss, alleging the statute had been offended and that the Missouri trial court no longer had jurisdiction. The parties agreed the motion would be decided upon stipulated facts. The stipulated facts were as follows:

1. On June 3, 1998, Defendant Robertson was charged, in CR198–002300, with the class C felony of Stealing a Motor Vehicle. This charge was filed in .Clay County, Missouri;

2. On August 12, 1998, pursuant to Chapter 548 of the Revised Statutes of Missouri, a Governor's warrant was signed by Missouri Governor, Mel Carnahan and Secretary of State Rebecca Cook;

3. On August 20, 1998, Texas Governor George Bush, along with Texas Secretary of State, Alberto R. Gonzales signed a Texas warrant ordering Defendant Robertson turned over to Missouri authorities;

4. Defendant Robertson was not returned to Missouri on the authority of these documents. He remained in the custody of the State of Texas where he had charges pending;

5. On September 29, 1999, Defendant Robertson was charged by indictment, in CR199–004232, with the two count felony of Murder in the First Degree as well as the Class C felony of Stealing a Motor Vehicle in the State of Missouri. He was still in Texas custody;

6. Count II of CR199–004232 contained the same factual allegations which comprised CR198–002300;

7. In June of 2000, the Prosecuting Attorney for Clay County, Missouri requested custody of the Defendant from Texas pursuant to Chapter 217.490 (the

---

1. All statutory references are to RSMo 1994 unless otherwise noted.

Agreement on Detainers). At the time of this second request, Defendant Robertson was serving a five year sentence in Texas for Stealing a Motor Vehicle;

8. The State of Texas, pursuant to the Agreement on Detainers, released the Defendant to the temporary custody of Clay County, Missouri authorities on June 23, 2000. Defendant Robertson remains under Texas authority until 2003;

9. The Defendant was brought to the State of Missouri and booked into the Clay County Jail on July 27, 2000. Both the warrant for the 1998 complaint and the 1999 indictment were served upon him on that date;

10. On October 5, 2000, after Defendant Robertson has been brought to Missouri, the Prosecuting Attorney's Office dismissed CR198–002300 (the single count charge of Stealing a Motor Vehicle);

11. Before being brought to Clay County from Texas, the Defendant filed a civil suit against a sheriff in the State of Texas. This case was captioned *Thomas S. Robertson, Plaintiff vs. Jim Bowles, Defendant; Civil Action No. 3:99–CV0288–1.* That case alleged that Sheriff Bowles had committed civil improprieties while the defendant had been in his custody. The factual details of those allegations are not germane to the Clay County case;

12. On January 11, 2002, the following order was signed by Federal District Judge Sam A. Lindsay: United States District Court for the Northern District of Texas, Dallas Division—Order Requiring Removal of Thomas Robertson from Clay County, Mo. Trial of *Thomas S. Robertson, Plaintiff v. Jim Bowles, Defendant; Civil Action No. 3:99–CV0288–1* in Texas, order dated January 11, 2002, signed Sam A. Lindsay, United States District Judge. Judge Lindsay also signed a writ of Habeas Corpus Ad Testificandum ordering that the defendant be taken to Texas;

13. Defendant Robertson said or did nothing to facilitate the civil case being set on a docket for trial in federal court;

14. On January 31, 2002, Federal Marshals went to the Clay County Jail and took the Defendant from that facility and brought him to Texas. Defendant Robertson was not allowed to bring his legal paperwork with him to the State of Texas;

15. Prior to the Defendant Robertson being taken by federal authorities on January 31, 2002, Assistant Prosecuting Attorney Kevin Baldwin spoke to Judge Lindsay's clerk and expressed his desire that the Defendant Robertson remain in Clay County until his case was resolved. However, the Prosecuting Attorney's Office was not notified by the jail at the time that the defendant was removed from the jail by federal marshals on January 31st;

16. In an order dated January 31, 2002, Sam A. Lindsay, United States District Judge ordered that trial of *Thomas S. Robertson, Plaintiff v. Jim Bowles, Defendant* commence February 8, 2002. This order was specifically made because of the Defendant's Clay County custody status. During the trial, which took approximately one day, Defendant Robertson was required to try the civil case in a jail issued uniform because the Federal authorities would not let him wear civilian clothing during the civil proceedings. Defendant Robertson was also required to try the civil case in which he was the plaintiff without his legal paperwork because the Federal Marshals had not let him bring it with him;

17. After the trial, Judge Lindsay issued an order requiring pretrial proposed findings from the parties in the case of *Thomas S. Robertson, Plaintiff v. Jim Bowles, Defendant* by February 28, 2002;

18. This order was sent via certified mail dated February 20, 2002 to Thomas S. Robertson and was addressed to the Defendant Clay County, Missouri Detention Center while he was still being held in Texas. Defendant Robertson did not receive this Order until well past the deadline set out in the Order;

19. Defendant Bowles' proposed Findings of Fact and Conclusions of Law in case of *Thomas S. Robertson, Plaintiff vs. Jim Bowles, Defendant* were filed on 2/20/02 by his attorneys. The attorney for Defendant Bowles also continued to send time sensitive documents to Defendant Robertson at the Clay County Jail even though he was in Texas;

20. In a Memorandum Opinion and Order in the case of *Thomas S. Robertson, Plaintiff v. Jim Bowles, Defendant* dated March 8, 2002, signed Sam A. Lindsay, United States District Judge, the Court found in favor of Defendant Bowles. At the time of this finding, not only was Defendant Robertson still unaware that he had been advised by a letter sent to the Clay County Jail to submit proposed findings to the Federal Court, but because of the misdirection of his mail, he had missed the deadline to do so;

21. On April 2, 2002, Defendant Robertson was returned from Texas by Federal Marshals to the Clay County Jail. After his return to Missouri, his pending Clay County trial had to be continued.

The *trial court denied the motion and afforded* Mr. Robertson the opportunity to apply for a writ of prohibition. The writ was denied, and the case proceeded to trial.

At trial, Mr. Robertson denied killing Ms. Styles and claimed he left the apartment just after midnight, before the murder occurred, on May 29, 1998, to drive to Dallas, Texas, for various reasons. There was no evidence of sudden passion presented at trial as Mr. Robertson's defense was that he was not present and not that he acted under sudden passion.

The jury was instructed on murder in the first-degree and conventional murder in the second-degree. The second-degree murder instruction contained the optional paragraph informing the jury that to find Mr. Robertson guilty of second-degree murder, it must find that he did not cause the victim's death while "under the influence of sudden passion arising from adequate cause." No voluntary manslaughter instruction was given.

The jury found Mr. Robertson guilty of murder in the second-degree. After overruling Mr. Robertson's motion for a new trial, the court sentenced Mr. Robertson, as a prior and persistent offender, to life imprisonment with no opportunity for probation or parole. Mr. Robertson's timely appeal followed.

## Motion to Dismiss

In his first point on appeal, Mr. Robertson contends the trial court erred in overruling his Motion to Dismiss pursuant to section 217.490, the IAD. He argues the State violated the antishuttling provision contained in Article IV(5) of the IAD when it brought Mr. Robertson to Missouri from Texas by means of a detainer and then allowed him to return to Texas before bringing him to trial in Missouri. Mr. Robertson claims this violation divested the Missouri trial court of its jurisdiction, and, therefore, the trial was held and the

judgment of conviction was entered without jurisdiction.

Whether a court has jurisdiction is a question of law reviewed *de novo* without deference to the trial court's determination. *State ex rel. Nixon v. Moore*, 159 S.W.3d 488, 490 (Mo.App. W.D.2005). To the extent that the application of law is based upon facts presented, the facts will be viewed in the light most favorable to the judgment. *State v. Lybarger*, 165 S.W.3d 180, 184 (Mo.App. W.D.2005).

■■■ The IAD is a compact among the states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. *State ex rel. Noble v. Barker*, 706 S.W.2d 76, 78 (Mo.App. S.D.1986). It allows a prisoner in one state to seek disposition of criminal charges filed against him by the second state. *Lybarger*, 165 S.W.3d at 184. Missouri adopted the IAD in section 217.490. *Rivera v. State*, 106 S.W.3d 635, 639 (Mo.App. S.D.2003). The IAD is meant "to encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." *United States v. Mauro*, 436 U.S. 340, 343, 98 S.Ct. 1834, 1839, 56 L.Ed.2d 329 (1978); Section 217.490, Article I. In order to achieve this goal, the IAD must be construed liberally. *Lybarger*, 165 S.W.3d at 184. The IAD was created, in part, because of evidence indicating that, once a detainer is lodged against an inmate, the inmate's status within the prison changes adversely. *State ex rel. Clark v. Long*, 870 S.W.2d 932, 937 (Mo.App. S.D.1994). Further, in order for rehabilitation and treatment programs to be planned and carried out, untried charges must be disposed of by trial or dismissal within a reasonable

period of time. *Id.* at 937–38. Finally, the state and society have a strong interest in having pending charges tried in a timely fashion. *Id.* at 938.

■■■ The IAD controls when a detainer is filed with the custodial or sending state by another state that has untried charges pending against the prisoner. *Mauro*, 436 U.S. at 343, 98 S.Ct. 1834. The IAD identifies the parties as either the sending state or receiving state. "State" is defined as "a state of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the commonwealth of Puerto Rico." Section 217.490, Article II. A sending state is "a state in which a prisoner is incarcerated at the time ... that a request for custody or availability is initiated[.]" *Id.* A receiving state is a "state in which trial is to be had on an indictment, information or complaint[.]" *Id.* In the context of this case, Texas was the sending state and Missouri was the receiving state.

■■■ Once a detainer has been filed, the time constraints contained in Articles III and IV govern. The time constraints pertain to the time in which the prisoner must be brought to trial in the receiving state. At issue in this case is the following provision, known as the antishuttling provision:

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to paragraph 5 of Article V of this agreement, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

Section 217.490, Article IV(5).[2] Mr. Robertson contends that he was returned to

---

2. Paragraph 5 of Article V of the IAD states:

"At the earliest practicable time consonant

Texas, his original place of imprisonment, before trial was had in Missouri; thus, he argues the Missouri indictment was no longer of any force or effect and should have been dismissed by the trial court pursuant to this statutory authority.

Mr. Robertson relies on *Alabama v. Bozeman*, 533 U.S. 146, 149, 121 S.Ct. 2079, 2082, 150 L.Ed.2d 188 (2001), and contends it controls and resolves this case. In *Bozeman*, the defendant was moved from a federal prison in Florida, where he was serving a term of imprisonment, to a county jail in Alabama pursuant to a detainer lodged by the State of Alabama. *Id.* at 151, 121 S.Ct. 2079. The defendant remained in Alabama for one day for the pretrial proceedings and then was transported back to the federal prison in Florida. *Id.* Approximately one month later, he was brought back to Alabama for trial. *Id.* At that time, defendant filed a motion to dismiss claiming the antishuttling provision of the IAD had been violated and, as a result, the Alabama trial court no longer had jurisdiction to try him. *Id.*

The State of Alabama conceded the violation of the IAD antishuttling provision, but claimed it technical, harmless, and de minimis. *Id.* at 153, 121 S.Ct. 2079. It further argued that returning the defendant to the federal prison opposed to housing him in the county jail was consistent with the goal of not interrupting the defendant's rehabilitation, especially considering the fact that the defendant would have received no rehabilitation if he had remained in the county jail until brought to trial in Alabama. *Id.* at 152–53, 121 S.Ct. 2079. The United States Supreme Court rejected the State's argument that inconsequential, technical, de minimis, or trivial violations of the antishuttling provision constituted exceptions to the IAD in light of the IAD's purpose. *Id.* at 154, 121 S.Ct.

2079. It held that the IAD must be literally interpreted and that there were no exceptions, implicit or otherwise, to the antishuttling provision. *Id.*

Mr. Robertson accurately states *Bozeman's* holding that any violation of the antishuttling provision, regardless of how brief or minimal, triggers the IAD's dictate that the indictment, information or complaint shall not be of any further force or effect and that the cause shall be dismissed with prejudice. *Bozeman* does not resolve this case, however, as the IAD antishuttling provision was not violated. The antishuttling provision prohibits a receiving state from returning a prisoner to the original place of imprisonment pursuant to Article V(5) before trial is had. Article V(5) is the mandate that the prisoner shall be returned to the sending state as soon as practicable. Thus, the antishuttling provision contained in Article IV(5) prohibits a receiving state from returning a prisoner to the sending state before bringing the prisoner to trial in the receiving state. The sending state in this case was Texas; the receiving state was Missouri. Mr. Robertson was taken from the State of Missouri while in federal custody to federal jurisdiction located within the State of Texas by federal marshals, pursuant to a federal judge's order, to appear in a federal cause of action. The people, acting through the member states, created the United States of America, a separate sovereignty, granting to it certain stated and implied powers expressed in the Constitution. The United States Government's presence exists throughout all the states of the union, its holdings and protectorates, including the member states of the IAD. Under the definition of "state" in the IAD, the United States of America is a separate member state. The federal gov-

with the purposes of this agreement, the pris-

oner shall be returned to the sending state."

ernment was a separate "state" in this case. Thus, Mr. Robertson was not returned to the sending state of Texas. He was, instead, taken to the third party "state" of the United States of America.

■ Mr. Robertson was physically taken to the geographical location of the State of Texas, but he was not returned to the sending "state" of Texas under the IAD. He was taken from the receiving "state" of Missouri to the third member state, the "state" of the United States of America. Jurisdiction is determined by statute and not by geography. *New Jersey v. New York*, 523 U.S. 767, 823 n. 12, 118 S.Ct. 1726, 1757, 140 L.Ed.2d 993 (1998)(citing *United States ex rel. Belardi v. Day*, 50 F.2d 816, 817 (C.C.A.3 1931)). The statutes governing jurisdiction frequently involve determinations of geography but that does not change the principle of law that jurisdiction is governed by statute and not geography. And although the IAD clearly provides that the United States of America is a separate "state," it was not the sending state in this case. Granted that Mr. Robertson was taken to the geographical location of Texas, he was never returned to the custody and jurisdiction of the State of Texas; he was taken to the "state" of the United States of America and was in federal custody the entire time of his absence from the State of Missouri commencing when the Federal Marshals obtained his custody from the State of Missouri. As Mr. Robertson was not returned to the sending state, the antishuttling provision contained in Article IV(5) was not violated.

The holding that the antishuttling provision in this case was not violated is consistent with cases decided by other jurisdictions. In *Shigemura v. United States*, 726 F.2d 380, 381 (8th Cir.1984), the defendant was serving a sentence of imprisonment in the St. Louis County jail. A federal detainer had been lodged against defendant,

and he was taken from and returned to the county jail several times to appear in federal court. *Id.* The defendant argued this violated the antishuttling provision of the IAD as he was returned to his original place of imprisonment, the county jail, before being tried on the federal charges. *Id.* The court held that IAD had not been breeched, even though defendant was taken from the county jail to appear in federal court and returned to the county jail before being tried in the federal court. *Id.* No federal penal institution was located in the St. Louis area, and the St. Louis County jail had been approved by the Department of Justice as a facility to hold prisoners awaiting federal trial. *Id.* The court noted the coincidence that the same physical building was used to house defendant for both state and federal charges. *Id.*

■ *Shigemura* demonstrates that the physical geographical location of the prisoner is not the significant fact under the IAD. The significant fact is the prisoner's custody. In *Shigemura*, the prisoner was in the same physical location. He had been transferred from state custody to federal custody and was not transferred back to state custody until trial was had on the federal charges. In this case, Mr. Robertson was transferred from Missouri state custody to federal custody and then back to Missouri state custody. No violation of the IAD antishuttling provision occurred because Mr. Robertson was brought to trial on the Missouri charges before being returned to Texas state custody. *See also United States v. Hunnewell*, 891 F.2d 955, 958 (1st Cir.1989)(affirming the district court's finding that defendant was not returned to state custody in light of the common practice in Maine of housing federal prisoners in state facilities, an order remanding the defendant to federal custody, a letter to the warden confirming the defendant's status

as a federal prisoner, and the fact that the United States Marshals' Service paid for the defendant's board); *U.S. v. Kelley,* 300 F.Supp.2d 224, 230 (D.Mass.2003)(stating: "So long as custodial responsibility actually shifts and applicable temporal limits are observed, retention of the prisoner in the same institutional setting cannot signify that he was 'returned to [his] original place of imprisonment' within the meaning of Article IV(e) of the IAD." (quoting *Hunnewell,* 891 F.2d at 959)). Federal authorities took Mr. Robertson to Federal District Court in Texas, and although he was physically within the geographic boundaries of Texas, he remained in federal custody and not the State of Texas' custody.

Mr. Robertson also argues that this case is similar to *People v. Browning,* 108 Mich. App. 281, 310 N.W.2d 365 (1981). In that case, the defendant was imprisoned in a federal prison in Indiana when the State of Michigan lodged a detainer against him. *Id.* at 287, 310 N.W.2d 365. Pursuant to the detainer, the prisoner was moved from the federal prison in Indiana to the federal prison in Michigan. *Id.* He was then taken from the federal prison in Michigan and transferred to the custody of the Detroit police whenever there was a court date in the state case. *Id.* at 287–88, 310 N.W.2d 365. After the pretrial matters were concluded, the prisoner was returned to the federal prison in Indiana until such time as his state trial in Michigan began. *Id.* at 288, 310 N.W.2d 365. The appellate court held that the prisoner's return to the federal prison in Indiana violated the Article IV(5) antishuttling provision. *Id.* at 298–99, 310 N.W.2d 365.

The State of Michigan argued that the prisoner was returned to the federal prison in Indiana at the request of federal officials and claimed it should not be penalized for the actions of the federal government. *Id.* The court stated:

> Where the transfer back is not done at the request of defendant or his attorney, we believe that the state should be charged with the responsibility therefor. In no other way can the defendant's right to final disposition before return be adequately safeguarded. This is not to say that, if absolute proof were given that the state authorities had nothing to do with the transfer and in fact attempted to stop it, another result might be reached. . . . Thus, because defendant did not request or clearly acquiesce in the transfer and because the state has not established that the transfer was effected against its wishes, the failure to try defendant before returning him to Terre Haute constitutes a violation of Article IV(e) of the IAD.

*Id.* at 299–300, 310 N.W.2d 365. Mr. Robertson argues that, because he did not request to be transferred to Texas for purposes of adjudicating his federal cause of action and because the transfer disadvantaged him in that he was unable to take with him his legal documents and did not receive time sensitive documents, the State of Missouri, and not he, should bear the legal hardship. *Browning* presented a different case than the one before this court. In *Browning,* the United States was the sending "state" and the defendant was returned to the sending state before trial was had in the Michigan cause of action. Thus, there was a violation of the antishuttling provision and Michigan argued that the violation was not the result of its actions, but rather resulted from the actions of the sending state. Other cases cited by Mr. Robertson also involve situations where there was a violation of the antishuttling provision. As discussed, *supra,* there was not a violation of the antishuttling provision in Mr. Robertson's case. As there was no violation, there can be no

discussion regarding who bears the fault for the violation.

The point is denied.

## Instruction No. 6

In his second point on appeal, Mr. Robertson contends the trial court committed plain error in giving Instruction No. 6, the verdict director for murder in the second-degree. He claims the instruction was not in conformity with the Missouri Approved Instructions because, although the voluntary manslaughter instruction was not given, Instruction No. 6 contained the optional third paragraph requiring that to find him guilty of second-degree murder, the jury first had to find that he did not cause the death of Ms. Styles while he was "under the influence of sudden passion arising from adequate cause." Mr. Robertson claims this optional paragraph confused the jury and that this confusion was compounded when the State errantly argued in its closing argument that the difference between murder in the first-degree and murder in the second-degree was whether Mr. Robertson acted under the influence of sudden passion.

▆▆▆▆ Mr. Robertson did not object to verdict directing instruction No. 6 on the issue he presents here, and he did not preserve this issue for appellate review. Rule 28.03 governs objections to jury instructions and verdict forms and states:

> Counsel shall make specific objections to instructions or verdict forms considered erroneous. No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

A party who fails to object to an instruction as required by Rule 28.03 fails to preserve a claim of error with respect to that instruction for purposes of appellate review. *State v. Johnson*, 95 S.W.3d 221, 225 (Mo.App. S.D.2003). Mr. Johnson, therefore, requests plain error review. Unpreserved points of error regarding instructions or verdict forms may be reviewed for plain error if manifest justice would otherwise occur. *State v. Wurtzberger*, 40 S.W.3d 893, 898 (Mo. banc 2001). But, review of jury instructions for plain error is discretionary. *State v. Lewis*, 955 S.W.2d 563, 566 (Mo.App. W.D.1997). "Plain errors are clear, evident and obvious." *Lewis v. State*, 152 S.W.3d 325, 327 (Mo.App. W.D.2004). Plain error occurs only where the court has a substantial belief that manifest injustice or miscarriage of justice has occurred. *Id.* at 327–28. An appellate court's discretion to reverse a conviction on the basis of plain error should be used sparingly, and instructional error rarely rises to the level of plain error. *State v. Hawkins*, 58 S.W.3d 12, 17 (Mo.App. E.D.2001). "A defendant must go beyond a mere demonstration of prejudice and establish that the instructional error affected the jury's verdict." *Id.*

At trial, the jury was given verdict-directing instructions for murder in the first-degree and conventional second-degree murder. The instructions were submitted by the State. Neither party offered the MAI voluntary manslaughter instruction, and it was not given.

▆▆▆▆ A trial court commits error when it gives an instruction that does not comply with the Missouri Approved Instructions (MAI) or the accompanying Notes on Use, although the prejudicial effect of the error must be judicially determined. *State v. Mickle*, 164 S.W.3d 33, 61 (Mo.App. W.D. 2005). The verdict directing instruction for murder in the second-degree is set forth in MAI–CR3d 313.04. *State v. Ever-*

*age*, 124 S.W.3d 11, 15 (Mo.App. W.D. 2004). That was the instruction given. The second-degree murder verdict director given to the jury stated:

### Instruction No. *6*

 If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 29, 1998, in the City of Clay, State of Missouri, the defendant caused the death of Kathy Styles by strangling her, and

Second, that defendant knew that his conduct was practically certain to cause the death of Kathy Styles, *and*

*Third, that defendant did not do so under the influence of sudden passion arising from adequate cause,* then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

*As used in this instruction, the term sudden passion means passion directly caused by and arising out of provocation by Kathy Styles which passion arose at the time of the offense and was not solely the result of former provocation. The term adequate cause means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.*

The portions of the instruction emphasized are at issue in this case. This "sudden passion" language in a second-degree murder instruction is meant to justify the giving of a voluntary manslaughter instruction. *Hawkins*, 58 S.W.3d at 19. This language must be included when there is evidence supporting a finding that the defendant caused the victim's death under the influence of sudden passion arising from adequate cause. *Id.*

The instruction given did not deviate from the MAI. Instead, optional language, authorized by the MAI, was included. The Notes on Use for MAI–CR3d 313.04 contain the following guidelines:

> 4.... If there is evidence supporting sudden passion from adequate cause, paragraph (Third) must be given....
>
> ....
>
> 7. When any of the following terms are used in this instruction, the paragraph defining that term must be used:
>
> "sudden passion"
>
> ....

The Notes on Use require that the optional "sudden passion" language be given where evidence of sudden passion was presented at trial. The Notes on Use do not state that the optional language may only be given in such a circumstance, though. The optional language is a correct statement of the law regardless whether evidence of sudden passion was admitted and a voluntary manslaughter instruction is given as a lesser-included offense. Thus, the instruction given did not offend the MAI and the Notes on Use, and the issue is whether giving the additional language as a part of the instruction was "clear, evident and obvious error" resulting in "manifest injustice or miscarriage of justice."

*State v. Hawkins*, 58 S.W.3d 12 (Mo. App. E.D.2001), which has facts quite similar to this case, is helpful in resolving this point. In *Hawkins* the defendant was convicted of murder in the first-degree. *Id.* at 15. The jury was given verdict direct-

ing instructions for murder in the first-degree, murder in the second-degree, and self-defense, but not voluntary manslaughter. *Id.* at 16. The defendant failed to preserve his objection to the verdict director for murder in the second-degree, and the court reviewed it for plain error. *Id.* The defendant argued that plain error occurred because the verdict director for murder in the second-degree contained the optional sudden passion paragraphs despite the fact that no voluntary manslaughter instruction had been given. *Id.* at 16, 19. He claimed that the "sudden passion" language confused the jury and caused the jury to convict him of the higher first-degree murder offense. *Id.* at 19. More specifically, defendant argued that the jury could have been confused by "sudden passion" language in the instructions given the fact that neither party had used those words during trial. *Id.*

*Hawkins* presented facts more supportive of plain error than the facts in this case. During the course of the trial, counsel differentiated murder in the first-degree from murder in the second-degree by describing the crime as either "cold-blooded" or "hot-blooded." *Id.* Defendant claimed the jury construed "hot-blooded" as synonymous with second-degree murder and "cold-blooded" as synonymous with first-degree murder. *Id.* He further argued that the jurors could have considered the term "sudden passion" as a more legally correct way of saying "hot-blooded." *Id.* Thus, he argued, the jury could have concluded that the optional third paragraph in the instruction should have read: "Third, that defendant did so under the influence of sudden passion arising from the adequate cause." *Id.*

There was evidence of juror confusion in *Hawkins*. During deliberations, the jury sent the trial court a note stating: "Please clarify on instruction 6 part 3, is the DID

NOT DO SO the correct verbage [sic] describing second-degree murder? Does the word not belong in this statement?" *Id.* Additionally, the jury sent out Instruction No. 6 with the third paragraph circled, the "did not do so" portion of the paragraph underlined, and a question mark placed in the left margin next to the circled paragraph. *Id.* at 19–20. The trial court responded to the jury's inquiry by stating: "You must be guided by the instructions previously given by the Court." *Id.* at 20.

The Eastern District noted the "general rule that a conviction of a higher degree of a crime renders any error in an instruction on a lower degree of the crime not prejudicial, unless the error prevents a conviction on the lesser crime." *Id.* The appellate court then determined that the "sudden passion" language contained in the instruction did not prevent the jury from convicting the defendant of murder in the second-degree. *Id.* It noted that the instruction correctly stated the elements of second-degree murder and the law that defendant "did not do so under the influence of sudden passion." *Id.* The court acknowledged that the jury had questioned the instruction, but stated that the trial court had answered the questions accurately, and the jury had been told to follow the instruction. *Id.* Thus, the court held that there was no plain error. *Id.* The dissent in *Hawkins* focused on the jury's inquiries regarding the meaning of the third paragraph in the second-degree murder instruction and claimed this showed the jury was confused and that the "sudden passion" language affected the verdict. *Id.* at 27.

Mr. Robertson argues that the inclusion of the "sudden passion" language in the instruction combined with the prosecutor's misstatement of the law during closing argument confused the jury.

During her closing argument, the prosecutor made the following statement:

> The final issue, the final element in this case is that the defendant killed Kathy Styles after deliberation. This is the main difference between your murder one and the murder two charge. In the murder two charge, Murder in the Second-degree, you have to have that it was under the influence, that he committed the murder under the influence of sudden passion, and the sudden passion is from the provocation that Kathy Styles did at that—

At that point, the defense counsel asked to approach the bench. Out of the hearing of the jury, a discussion was had between counsel and the court wherein the prosecutor indicated that she believed the difference between first-degree and second-degree murder to be the presence of sudden passion. The trial court then explained that the difference between first and second-degree murder was deliberation and that sudden passion differentiated second-degree murder from voluntary manslaughter. The trial court then asked the prosecutor if what it just stated made sense and the prosecutor answered affirmatively. Then the following exchange took place:

> The Court: I believe the rest of [the prosecutor's] argument will be in accord with what we have said here. If there was any confusing issue that might have come up, I think it can be straightened out easily when you argue the case. I think I'd do more harm than good if I tried to straighten it out.
>
> [Defense Counsel]: And I'm not asking for that, Judge.

The prosecutor then continued her closing argument. She explicitly stated that the difference between first and second-degree murder was deliberation and then proceeded to define deliberation and point out evidence she believed showed deliberation.

When the defense made its closing argument, it informed the jury that the difference between first and second-degree murder was "cool reflection" and then proceeded to explain what cool reflection entailed. When the prosecution finished its closing argument, it again stated that the difference between first and second-degree murder was deliberation. Both sides focused heavily on the issue of whether deliberation can be brief in time and the distinction between deliberating and reacting.

■ The prosecutor did misstate the law during her closing argument when she stated that the difference between first and second-degree murder was sudden passion. A misstatement of the law must be interpreted within the context of the entire record, however, and not in isolation. *State v. Collins*, 150 S.W.3d 340, 355 (Mo.App. S.D.2004). Further, the jury is presumed to have followed the instructions as given in rendering its decision. *Mickle*, 164 S.W.3d at 61. "Where a prosecutor misstates the law but the jury is properly instructed ... the jury is presumed to have followed the instructions." *State v. Berry*, 168 S.W.3d 527, 534 (Mo. App. W.D.2005). *See also, State ex rel. Mo. Highway & Transp. Comm'n v. Our Savior Lutheran Church*, 922 S.W.2d 816, 819 (Mo.App. E.D.1996); *State v. Blakeburn*, 859 S.W.2d 170, 175 (Mo.App. W.D. 1993).

■ In this case, the law was misstated one time, the error was brought to the prosecutor's attention, and the law was correctly stated at least three times thereafter. Further, the jury did not question the instruction at issue in this case. No indication exists that the jury was confused regarding the "sudden passion" language when it rendered its verdict. Given *Hawkins*, the presumption that the jury followed the verdict directing instructions,

which accurately stated the law, and the utter lack of evidence suggesting jury confusion, no "clear, evident and obvious" error transpired, and "manifest injustice or miscarriage of justice" did not occur. The trial court did not commit plain error in publishing the second-degree murder instruction with the optional sudden passion language.

The point is denied.

### Conclusion

Both of Mr. Robertson's points are denied, and the judgment of convictions is affirmed.

All concur.